## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF MASSACHUSETTS;
STATE OF NEW YORK; STATE OF
COLORADO; PEOPLE OF THE STATE OF
CALIFORNIA; STATE OF ARIZONA; STATE OF
CONNECTICUT; STATE OF DELAWARE; THE
DISTRICT OF COLUMBIA; STATE OF
HAWAI'I; STATE OF ILLINOIS; STATE OF
MAINE; STATE OF MARYLAND; STATE OF
MICHIGAN; STATE OF MINNESOTA; STATE
OF NEVADA; STATE OF NEW JERSEY; STATE
OF NEW MEXICO; STATE OF OREGON; STATE
OF RHODE ISLAND; STATE OF VERMONT;
COMMONWEALTH OF VIRGINIA; STATE OF
WASHINGTON; and STATE OF WISCONSIN,

      Plaintiffs,

        v.

U.S. DEPARTMENT OF EDUCATION and
LINDA McMAHON, in her official capacity as
SECRETARY OF THE U.S. DEPARTMENT OF
EDUCATION,

      Defendants.

Case No. 1:25-cv-13244

## INTRODUCTION

1.    In the nearly two decades since Congress created the Public Service Loan Forgiveness ("PSLF") program, PSLF has provided over one million public service workers—including police officers, firefighters, military personnel, teachers, nurses, and social workers—with more than $85 billion dollars in federal student loan forgiveness. PSLF has yielded tremendous benefits to employers, including Plaintiff States, and has allowed them to recruit and retain educated employees who have committed themselves to public service.

1

2.      On October 31, 2025, the Department of Education ("Department") promulgated a new Final Rule, which will become effective on July 1, 2026, that threatens to strip eligibility for PSLF from public service workers by designating their employers—including State governments—as having a "substantial illegal purpose."

3.      The PSLF Statute provides no grounds for the Department to create exceptions to PSLF eligibility. The phrase "substantial illegal purpose" does not appear in, nor is it contemplated by, the statute. The so-called "illegal" purposes set forth in the rule are also plainly pretextual. The only forms of "illegality" named are a cherry-picked list of this Administration's most disfavored groups and activities, including support for immigrants, gender affirming care, diversity, equity and inclusion initiatives, and political protest. In seeking to crack down on specific activities disfavored by this Administration, the true intent behind the Rule is clear. The Department seeks to chill the activities of public service employers by discouraging their employees from what it deems objectionable forms of public service. To accomplish this goal, the Rule purports to empower the Department of Education to serve as a roving enforcer of the Administration's animus by stripping PSLF eligibility from employers whose actions it dislikes. And it does so openly: the Department *admits* that the Rule "is focused on specific illegal conduct that" President Trump "has determined that the Department should focus on" and that he "has identified as being of greatest concern." 90 Fed. Reg. at 48975, 48976.

4.      Congress never intended and did not permit anything of the sort. Defendants' Rule directly contravenes the PSLF Statute and is thus contrary to law and in excess of Defendants' authority, in violation of the Administrative Procedure Act ("APA"). When Congress enacted the PSLF program, it directed that the Department "*shall* cancel the balance of interest and principal due" for any borrower who "has been employed in a public service job" and meets other statutory

requirements. 20 U.S.C. § 1087e(m)(1) (emphasis added). Congress defined "public service job" to include, *inter alia*, a "full-time job in . . . government (excluding time served as a member of Congress)." *Id.* § 1087e(m)(3). Congress spoke clearly: *all* government jobs are PSLF-eligible, with the sole exception of elected members of Congress themselves. Defendants' Rule unlawfully creates additional exceptions to that straightforward statutory definition, contrary to the PSLF Statute's plain terms and in excess of the Department's authority.

5.     The Rule is also arbitrary and capricious in violation of the APA. At every turn, the Rule confers virtually unlimited discretion on the Department of Education to deem entities as acting with a "substantial illegal purpose"—an overbroad and impermissibly vague term that is itself pretextual and aimed only at chilling activities that are disfavored by this Administration. The Rule's evidentiary and materiality standards are inconsistent, unsupported, and give the Department unfettered discretion to pick and choose which conduct warrants an employer's disqualification. The Rule provides no instructions or details on how notice will be communicated to employers or what procedures will govern their opportunity to respond. It also draws an unsupported distinction between federal and all other government employers, asserting that federal employers will comply with the law, while suggesting, without evidence, that State employers will not.

6.     The Court should declare the Final Rule to be unlawful, vacate it, and enjoin Defendants from enforcing or implementing the Final Rule.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act. 5 U.S.C. §§ 702, 704.

8.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff Commonwealth of Massachusetts is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the District of Massachusetts.

## PARTIES

9.      Plaintiff Commonwealth of Massachusetts is a sovereign state of the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief legal officer.

10.      Plaintiff State of New York, represented by and through its Attorney General Letitia James, is a sovereign state of the United States. The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

11.      Plaintiff State of Colorado is a sovereign state in the United States of America and is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

12.      Plaintiff the People of the State of California, represented by and through their Attorney General, Rob Bonta, bring this action on behalf of the sovereignty of the State of California. Cal. Gov. Code § 100. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the People in this matter.

13.      Plaintiff State of Arizona is a sovereign state in the United States of America. Arizona is represented by Attorney General Kris Mayes, who is the chief law enforcement officer of Arizona.

4

14.     Plaintiff State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

15.     Plaintiff State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

16.     Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

17.     Plaintiff State of Hawaiʻi, represented by and through its Attorney General Anne E. Lopez, is a sovereign state of the United States of America. The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statues § 28-1 to pursue this action.

18.     Plaintiff State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign state of the United States of America. Attorney General Raoul is the chief

legal officer for the State of Illinois and is authorized to pursue this action under Illinois law. *See* 15 ILCS 205/4.

19.      Plaintiff State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

20.      Plaintiff State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.

21.      Plaintiff the State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

22.      Plaintiff State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

23.      Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

24.     Plaintiff State of New Jersey, represented by and through its Attorney General, Matthew J. Platkin, is a sovereign State in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

25.     Plaintiff State of New Mexico, represented by and through its Attorney General Raúl Torrez, is a sovereign state of the United States of America. As the State's chief law enforcement officer, the Attorney General is authorized to act on behalf of the State of New Mexico in this matter.

26.     Plaintiff State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

27.     Plaintiff State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

28.     Plaintiff State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity R. Clark, who is Vermont's chief legal officer and is authorized to pursue this action on behalf of the State. Vt. Stat. Ann. tit. 3, § 159.

29.     Plaintiff Commonwealth of Virginia is a sovereign state of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the

Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2. [1]

30.    Plaintiff State of Washington, represented by and through its Attorney General, Nicholas W. Brown, is a sovereign State of the United States of America. The Attorney General of Washington is the chief legal advisor to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Wash. Rev. Code §§ 43.10.005-43.10.801.

31.    Plaintiff State of Wisconsin is a sovereign state of the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

32.    Defendant United States Department of Education is a cabinet agency within the executive branch of the United States government. 20 U.S.C. § 3411.

33.    Defendant Linda McMahon is the Secretary of the United States Department of Education and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity. 20 U.S.C. § 3412.

## LEGAL AND FACTUAL ALLEGATIONS

### I.    The Public Service Loan Forgiveness Program Statute.

34.    In 2007, under the College Cost Reduction and Access Act, 20 U.S.C. § 1070 *et seq.*, Congress enacted the Public Service Loan Forgiveness program.

---

[1] The sole amendments to this First Amended Complaint are those necessary to facilitate the inclusion of the Commonwealth of Virginia as a plaintiff. *See* ¶¶ 29, 52. Although Plaintiffs are not required to seek leave to amend, Plaintiffs conferred with Defendants prior to filing the Amended Complaint; Defendants consented to the proposed amendments; and all Parties agreed that these amendments should not alter the agreed-upon briefing schedule, Doc. No. 82.

35.     In creating PSLF, Congress recognized that when students graduate with significant amounts of debt, pursuing desired public service careers may not be possible for them. The PSLF program was a bipartisan effort designed to allow students "to pursue a career in public service and be able to take those jobs . . . often at lower pay . . ." and "relieve themselves of the huge burden of debt they face." 153 Cong. Rec. S 1245 (daily ed. Sept. 7, 2007) (statement of Sen. Sherrod Brown) (cleaned up).

36.     Plaintiff States, as employers, have stood as some of the most prominent beneficiaries of PSLF. Congress specifically recognized the importance of encouraging student borrowers to pursue careers in State and local government. PSLF was intended to "encourage and enable graduates to go into the public service fields they're interested in—and which our country so desperately needs—by providing loan forgiveness for first responders, early childhood educators, librarians, nurses, public defenders, and public prosecutors." 153 Cong. Rec. H7544 (daily ed. July 11, 2007) (statement of Rep. Jane Schakowsky). These positions were considered "some of the most important to our communities, yet . . . chronically undersupported." *Id.*

37.     The PSLF Statute, 20 U.S.C. § 1087e(m), provides that the Department of Education "shall cancel the balance of interest and principal due" on any Federal Direct Loan of a borrower who has made 120 monthly payments under qualifying payment plans and "has been employed in a public service job during the period in which the borrower makes each of the 120 payments." 20 U.S.C. § 1087e(m)(1).

38.     The PSLF Statute defines the term "public service job." Specifically, "[t]he term public service job" means--

(i) a full-time job in emergency management, government (excluding time served as a member of Congress), military service, public safety, law enforcement, public health (including nurses, nurse practitioners, nurses in a clinical setting, and full-time professionals engaged in health care practitioner occupations and health care

9

support occupations, as such terms are defined by the Bureau of Labor Statistics), public education, social work in a public child or family service agency, public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization), early childhood education (including licensed or regulated childcare, Head Start, and State funded prekindergarten), public service for individuals with disabilities, public service for the elderly, public library sciences, school-based library sciences and other school-based services, or at an organization that is described in section 501(c)(3) of Title 26 and exempt from taxation under section 501(a) of such title; or

(ii) teaching as a full-time faculty member at a Tribal College or University as defined in section 1059c(b) of this title and other faculty teaching in high-needs subject areas or areas of shortage (including nurse faculty, foreign language faculty, and part-time faculty at community colleges), as determined by the Secretary.

20 U.S.C. § 1087e(m)(3)(B).

## II.   Past and Present Public Service Loan Forgiveness Program Regulations.

39.    In 2008, The Department first promulgated the PSLF regulation, which was (and remains) codified at 34 C.F.R. § 685.219 (the "PSLF Regulation").

40.    The first version of the PSLF Regulation had a defined term, "public service organization," that was "derived from the statutory definition of 'public service job' in 20 U.S.C. § 1087e(m)(3)(B)." 73 Fed. Reg. 63232, 63242 (Oct. 23, 2008). "Public service organization," as defined, included "[a] Federal, State, local, or Tribal government organization, agency, or entity." 34 C.F.R. § 685.219(b) (eff. July 1, 2009).

41.    In 2022, the Department revised the PSLF Regulation to replace the defined term "public service organization" with the defined term "qualifying employer." 87 Fed. Reg. 65904, 65905 (Nov. 1, 2022). The defined term "qualifying employer" included a "United States-based Federal, State, local, or Tribal government organization, agency, or entity." 34 C.F.R. § 685.219(b) (eff. July 1, 2023). The Department made the change in order to "provide greater certainty, simplicity, and clarity." 87 Fed. Reg. 41878, 41932 (July 13, 2022).

42.    The currently applicable version of the PSLF Regulation became effective on July 1, 2024. *See* 88 Fed. Reg. 43820 (July 10, 2023).

43.    The term "qualifying employer" is defined under the currently applicable PSLF regulation as follows:

*Qualifying employer* means:

(i) A United States-based Federal, State, local, or Tribal government organization, agency, or entity, including the U.S. Armed Forces or the National Guard;
(ii) A public child or family service agency;
(iii) An organization under section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under section 501(a) of the Internal Revenue Code;
(iv) A Tribal college or university; or
(v) A nonprofit organization that—
     (A) Provides a non-governmental public service as defined in this section, attested to by the employer on a form approved by the Secretary; and
     (B) Is not a business organized for profit, a labor union, or a partisan political organization."

34 C.F.R. 685.219.

44.    Every version of the PSLF Regulation, including the current version, has maintained very similar language that defines Federal, State, local, or Tribal government organizations, agencies, or entities as eligible employers for PSLF. This regulatory definition is consistent with the PSLF Statute's definition of "public service job" as including "a full-time job in . . . government (excluding time served as a member of Congress)." 20 U.S.C. § 1087e(m)(3)(B).

45.    The version of the PSLF Regulation featuring provisions added by the Final Rule will become applicable as of July 1, 2026.

## III.    The Executive Order, Negotiated Rulemaking, and Proposed Rule.

46.    On March 7, 2025, President Trump signed Executive Order 14235 ("PSLF Executive Order"), titled "Restoring Public Loan Forgiveness." 90 Fed. Reg. 11885 (March 7, 2025). The PSLF Executive Order asserted that "the PSLF Program has misdirected tax dollars into activist organizations that not only fail to serve the public interest, but actually harm our national security and American values, sometimes through criminal means . . . and may push

students into organizations that hide under the umbrella of a non-profit designation and degrade our national interest, thus requiring additional Federal funding to correct the negative societal effects caused by these organizations' federally subsidized wrongdoing." *Id.*

47.    President Trump's PSLF Executive Order declared that "it is the policy of my Administration that individuals employed by organizations whose activities have a substantial illegal purpose shall not be eligible for public service loan forgiveness." *Id.*

48.    The PSLF Executive Order directed that:

The Secretary of Education shall propose revisions to 34 CFR 685.219, Public Service Loan Forgiveness Program, in coordination with the Secretary of the Treasury as appropriate, that ensure the definition of "public service" excludes organizations that engage in activities that have a substantial illegal purpose, including:

 (a) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;
 (b) supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;
 (c) child abuse, including the chemical and surgical castration or mutilation of children or the trafficking of children to so-called transgender sanctuary States for purposes of emancipation from their lawful parents, in violation of applicable law;
(d) engaging in a pattern of aiding and abetting illegal discrimination; or
(e) engaging in a pattern of violating State tort laws, including laws against trespassing, disorderly conduct, public nuisance, vandalism, and obstruction of highways.

*Id.*

49.    In response to the Order, the Department announced a negotiated rulemaking for PSLF. *See* Intent To Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee, 90 Fed. Reg. 14741 (Apr. 4, 2025). Negotiated rulemaking is a statutorily mandated process through which the Department must obtain the input of stakeholders on the content of a proposed student loan regulation. 20 U.S.C. § 1098a(b). The

Department held the negotiated rulemaking session from June 30 to July 1, 2025. At the negotiated rulemaking, the Department proposed a draft rule that closely hewed to the terms of the PSLF Executive Order and would allow the Department to unilaterally designate PSLF employers, including States, municipalities, and 501(c)(3) nonprofits, as having a "substantial illegal purpose," rendering them ineligible employers for PSLF.

50.     On August 18, 2025, the Department of Education published a Notice of Proposed Rulemaking. William D. Ford Direct Loan (Direct Loan) Program, 90 Fed. Reg. 40154 (Aug. 18, 2025) ("NPRM").

51.     The NPRM likewise closely hewed to the terms of the PSLF Executive Order. Again, the NPRM proposed a rule that would allow the Department to designate PSLF employers, including States, municipalities, and 501(c)(3) nonprofits, as having a "substantial illegal purpose," rendering them ineligible employers for PSLF. *Id.*

52.     Nearly 14,000 comments were submitted in response to the NPRM. Commenters, including all original Plaintiff States, stated that the rule as proposed in the NPRM was unlawful and harmful, and urged the Department to instead maintain the currently applicable PSLF Regulation.

**IV.   The Final Rule.**

53.     On October 31, 2025, the Department published the Final Rule that is the subject of this lawsuit. William D. Ford Direct Loan (Direct Loan) Program, 90 Fed. Reg. 48966 (Oct. 31, 2025) ("Final Rule" or "Rule"). Absent court intervention, the Final Rule will become effective on July 1, 2026. *See* 20 U.S.C. § 1089(c)(1).

54.     The primary substantive change made to the existing regulation by the Final Rule is to amend the regulatory definition of "qualifying employer" to exclude entities that have a so-

called "substantial illegal purpose," and thus to exclude borrowers who work for those entities

from receiving PSLF.

55.    Specifically, the Final Rule adds a new subsection (ii) to the definition of

"qualifying employer," so that term is defined as:

> *Qualifying employer* means:
>
> (i)
>    (A) A United States-based Federal, State, local, or Tribal government
>    organization, agency, or entity, including the U.S. Armed Forces or the National
>    Guard;
>    (B) A public child or family service agency;
>    (C) An organization under Section 501(c)(3) of the Internal Revenue Code of
>    1986 that is exempt from taxation under Section 501(a) of the Internal Revenue
>    Code;
>    (D) A Tribal college or university; or
>    (E) A nonprofit organization that—
>        (1) Provides a non-governmental public service as defined in this section,
>        attested to by the employer on a form approved by the Secretary; and
>        (2) Is not a business organized for profit, a labor union, or a partisan political
>        organization; and
>    (ii) Does not include organizations that engage in activities such that they have a
>    substantial illegal purpose, as defined in this section.

34 C.F.R. § 685.219(b)(27).[2]

56.    The Final Rule defines "substantial illegal purpose" as six specific categories of

conduct:

> *Substantial illegal purpose* means:
>
> (i) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration
> laws;
> (ii) Supporting terrorism, including by facilitating funding to, or the operations
> of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C.
> 1189, or by engaging in violence for the purpose of obstructing or influencing
> Federal Government policy;
> (iii) Engaging in the chemical and surgical castration or mutilation of children in
> violation of Federal or State law;

---

[2]All citations to the Final Rule referring to provisions of the PSLF Regulation cite to the
provision of the C.F.R. where the Final Rule will be codified upon its effective date.

(iv) Engaging in the trafficking of children to another State for purposes of emancipation from their lawful parents in violation of Federal or State law;
(v) Engaging in a pattern of aiding and abetting illegal discrimination; or
(vi) Engaging in a pattern of violating State laws as defined in paragraph (b)(34) of this section.

34 C.F.R. § 685.219(b)(30).

57.     Many of the terms within this definition, such as "chemical castration or mutilation" and "violating State law," are separately defined in the Rule. 34 C.F.R. §§ 685.219(b)(1), (3), (34); *see also infra* Section VI.A.

58.     The Rule purports to provide the Department authority to determine that a qualifying employer has a "substantial illegal purpose." 34 C.F.R. § 685.219(h)(1).

59.     Per the Rule, the Department makes that determination "by a preponderance of the evidence" and "considering the materiality of any illegal activities or actions." 34 C.F.R. §§ 685.219(h)(1), (i)(1)(ii).

60.     The Rule directs the Department to consider the following three categories as "conclusive evidence" that an entity has engaged in activities with a "substantial illegal purpose":

(i) A final judgment by a State or Federal court, whereby the employer is found to have engaged in illegal activities that have a substantial illegal purpose; (ii) A plea of guilty or *nolo contendere*, whereby the employer admits to have engaged in illegal activities that have a substantial illegal purpose or pleads *nolo contendere* to allegations that the employer engaged in illegal activities that have substantial illegal purpose; or (iii) A settlement that includes admission by the employer that it engaged in illegal activities that have a substantial illegal purpose described in paragraph (h) of this section.

34 C.F.R. § 685.219(h)(1).

61.     The Rule further provides that the Department may determine that a qualifying employer has engaged in activities that have a "substantial illegal purpose" if "the employer fails to certify that it did not participate in activities that have a substantial illegal purpose." 34 C.F.R. § 685.219(i)(1)(i).

15

62.    The Rule states that the Department will make its determination "after notice and opportunity to respond." 34 C.F.R. § 685.219(h)(1).

63.    The Rule states "in the event an employer is operating under a shared identification number or other unique identifier," *i.e.*, employment identification number for tax purposes, the Department shall "consider the organization to be separate if the employer is operating separately and distinctly." 34 C.F.R. §685.219(i)(2).

64.    After the Department has deemed a borrower's employer to have a "substantial illegal purpose," the borrower's employment and federal loan payments are no longer eligible for PSLF. 34 C.F.R. § 685.219(c)(4).

65.    The Rule provides "no recourse for a borrower" in this situation, "as the employer, not the borrower, is the entity that has not met the eligibility requirements for the PSLF program." NPRM, 90 Fed. Reg. at 40163; *see also* 34 C.F.R. § 685.219(g)(7) (stating no reconsideration process is available to borrowers).

66.    The Rule provides that an employer may regain eligibility after ten years or after the Secretary approves a corrective action plan. 34 C.F.R. § 685.219(j).

## V.    The Final Rule is Contrary to Law and in Excess of Statutory Authority Because It Expressly Contradicts the PSLF Statute.

67.    The PSLF Statute provides that the Department "*shall* cancel the balance" on any Federal Direct Loan for a borrower who "has been employed in a *public service job* during the period in which the borrower makes" 120 qualifying payments. 20 U.S.C. § 1087e(m)(1) (emphases added).

68.    The PSLF Statute defines "[t]he term 'public service job'" to include, among other things, "a full-time job in . . . government (excluding time served as a member of Congress)." 20 U.S.C. § 1087e(m)(3)(B).

16

69.     Congress spoke clearly: a full-time job in government is eligible employment for PSLF with only one exception: members of Congress themselves. The Final Rule acknowledges as much, admitting that the statute's exception for members of Congress shows "additional detail as to what types of jobs within" the category of "government" jobs Congress "meant to include or exclude." Final Rule, 90 Fed. Reg. at 48972.

70.     This has been "the contemporary and consistent" interpretation of the PSLF Statute, *see Bondi v. VanDerStok*, 604 U.S. 458, 480–81 (2025), as the PSLF Regulation has always included all government entities as eligible employers for PSLF.

71.     The Final Rule, for the first time, purports to give the Department the authority to exclude some government entities as eligible employers under PSLF.

72.     The Department does not have the authority to issue the Final Rule.

73.     A federal "agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Congress has not delegated the authority to the Department to create any exceptions to the PSLF Statute's eligibility criteria at all, let alone delegated the extremely broad, discretionary authority to revoke an employer's eligibility that the Department asserts in the Final Rule.

74.     Congress expressly defined by statute what constitutes eligible employment for PSLF, including all government employment except members of Congress. Specifically, Congress did not request nor direct the Department to alter or expand the definition that Congress laid out. The Department cannot substitute its own judgment for the judgment of Congress, nor can it speculate about what Congress would or "would not want," absent an actual Congressional directive. Final Rule, 90 Fed. Reg. at 48972.

75.    The Department asserts that it has the authority to promulgate the Final Rule on the basis of the Secretary's "broad authority to promulgate regulations to administer the programs administered by the Department of Education and to carry out his or her duties." NPRM, 90 Fed. Reg. at 40156; *see also* Final Rule, 90 Fed. Reg. at 48971 (invoking Department's "power to regulate title IV programs"). The Department invokes various statutes providing only general grants of rulemaking authority: 20 U.S.C. §§ 1221e–3, 1082, 3441, 3474, and 3471. NPRM, 90 Fed. Reg. at 40156 & n.4.

76.    These statutes do not give the Department (or the Secretary) authority to exclude certain government employers from PSLF where Congress has spoken clearly to the contrary.

77.    In addition, the Department asserts that the Rule "is justified on the same basis that the IRS is justified in using the Illegality Doctrine to deny or revoke tax exempt status granted under § 501(c)(3)." NPRM, 90 Fed. Reg. at 40157; *see also* Final Rule, 90 Fed. Reg. at 48975-76. The Illegality Doctrine, which stems from the common law of charitable trusts, allows the IRS to revoke an organization's 501(c)(3) nonprofit tax-exempt status upon a determination by the IRS that the organization's purposes or activities are illegal.

78.    But the Department cannot promulgate the Final Rule under the Illegality Doctrine. That doctrine has never been used in the way the Department purports to invoke it here: to allow freestanding authority for a federal agency other than the IRS to designate organizations as illegal.

79.    Nor can the IRS (let alone the Department) invoke the Illegality Doctrine to apply to government entities, as the Department seeks to do here. Its use by the Department as to nonprofits would nonsensically permit the Department to designate as illegal 501(c)(3) nonprofits that the IRS has *not* determined have illegal purposes or activities. Further, the Illegality Doctrine is based on hundreds of years of common law of trusts not applicable to student loans.

18

80.      Finally, the Department's interpretation of its statutory authority to allow it to promulgate the Final Rule would create numerous grave constitutional concerns, reinforcing the implausibility of Defendants' interpretation of their authority. The Department's extraordinary position—that a federal agency can deem a *state* entity to have a "substantial illegal purpose"—is antithetical to the basic principles of federalism. States, through their democratically elected representatives, retain broad autonomy in structuring their governments and pursuing policy objectives reflective of each State's electorate. In addition, it contravenes the basic principle of separation of powers because the Department, as part of the executive branch, has powers limited to those specifically conferred by the Constitution and federal statutes. Interpreting the PSLF Statute to grant unmoored discretion to the Department would violate the constitutional principle that Congress cannot delegate authority to executive agencies without providing an intelligible principle to guide their exercise of discretion.

81.      Further, the Department's attempt to wield this improper authority through the Final Rule would raise substantial constitutional concerns for non-government entities as well, including a chilling "deterrent effect," *see* NPRM, 90 Fed. Reg. at 40171; Final Rule, 90 Fed. Reg. at 48996, that, coupled with the Rule's vague standards, would infringe on individual constitutional rights such as those under the First Amendment and Due Process Clause.

## VI.    The Final Rule Is Arbitrary and Capricious Because It Is Unreasoned, Illogical, and Unjustified.

82.      The Department's Final Rule seeks to replace well-established definitions with sweeping carve-outs that grant the Department unfettered discretion to revoke PSLF eligibility for disfavored employers based upon the Administration's policy preferences. The Department redefines "qualifying employer" in a sharp departure from the corresponding definition of "public service job" that Congress put in place in 2007—and that has remained substantively intact since

then—but provides no adequate justification for this grant of unfettered discretion. The Rule is internally inconsistent and unclear as to the scope of activities the Department will rely on to revoke an employer's status. And finally, the Department effectively exempts Federal agencies from scrutiny under the Rule while targeting States, all without explanation.

### A. The Department Fails to Provide an Adequate Justification for the Definition of "Substantial Illegal Purpose."

83.    The Department claims that the Final Rule is intended to "improve the administration of PSLF and provide protection for taxpayers." NPRM, 90 Fed. Reg. at 40154; *see* Final Rule, 90 Fed. Reg. at 48997. It does no such thing.

84.    Instead, the Rule cherry-picks disfavored activities and brands them as having a "substantial illegal purpose," which the Department admits is designed to chill activity disfavored by the Administration. As explained below, each and every "substantial illegal purpose" identified in the Final Rule is a transparent cipher for one of the Administration's favorite political footballs, be it immigration, transgender individuals, Diversity, Equity, Inclusion, and Accessibility (DEIA) initiatives, or political protestors.

85.    The PSLF Executive Order upon which the Department purports to act further reveals the pretextual nature of the Final Rule. Specifically, the PSLF Executive Order instructs the Department to exclude disfavored "activist organizations" that fail to align with the Administration's view of "American values." 90 Fed. Reg. 11885.

86.    In providing justification for the Final Rule, the Department also repeatedly blurs the line between activity that is in fact "illegal," activity that is contrary to "public policy," and activity that is merely contrary to this Administration's political preferences. *See, e.g.*, Final Rule, 90 Fed. Reg. at 48966 ("The revisions strengthen accountability, enhance program integrity, and protect hardworking taxpayers from shouldering the cost of improper subsidies granted to

20

employees of organizations that undermine national security and American values through criminal activity."); *id.* at 48972 (arguing the Department is ensuring PSLF "only benefit[s] those borrowers working for organizations that truly serve a public purpose by helping, not harming, their communities").

87.    And the Final Rule itself *admits* that it "is focused on specific illegal conduct that [the President] has determined that the Department should focus on," as expressed in the Executive Order, "as being of greatest concern." *Id.* at 48975, 48976.

88.    Just as instructive as the categories of conduct the Department affirmatively targets is the Department's failure to prohibit any other kind of purported illegality by PSLF employers. By leaving virtually all other lawbreaking on the table, the Department lays bare the pretextual nature of its decision to target only discrete areas of disfavored conduct. And despite repeated claims in the Final Rule that the Department seeks to ensure taxpayer funds do not subsidize lawbreaking PSLF employers, the Department provides no rationale for publishing a Rule that overlooks most illegal conduct. There is no logical connection between the rationale offered by the Rule (to support only lawful conduct) and the Rule itself (which renders employers ineligible based on only a few select categories of assertedly unlawful activity).

89.    Put simply, the Final Rule is nothing more than a laundry list of this Administration's policy priorities designed to attack lawful conduct it does not agree with. The ambiguity and broad language of the Rule's "substantial illegal purpose" definition make the Rule's prohibitions sweeping, exposing Plaintiff States to ineligibility based on conduct that Plaintiff States maintain is lawful and may in fact be explicitly permitted or even required by state law. For example, the Department of Justice recently sued Plaintiff State New York, asserting that a New York State law relating to immigration enforcement at courthouses obstructs federal law

enforcement and facilitates the evasion of federal law. Similarly, the Department of Justice recently sued Plaintiff State of Colorado, asserting that Colorado State laws relating to immigration enforcement interfere with the Federal Government's enforcement of federal immigration law. And the Department of Justice has issued subpoenas to many health care providers that provide gender affirming care, notwithstanding that in Plaintiff States like California, healthcare for transgender residents is a legally protected right. *See* Cal. Civ. Code § 1798.301. While Plaintiff States strongly defend their conduct and laws as lawful, the Department may nevertheless decide that Plaintiff States or their agencies are ineligible for PSLF based on the Administration's policy preferences.

*Immigration*

90.　The Final Rule defines "substantial illegal purpose" to include "aiding or abetting violations of 8 U.S.C. [§] 1325 or other Federal immigration laws." 34 C.F.R. § 685.219(b)(30)(i). The Rule adopts the definition of "aiding and abetting" used in 18 U.S.C. § 2. *Id.* § 685.219(b)(1).

91.　8 U.S.C. § 1325 prohibits aliens from entering the United States "at any time or place other than as designated by immigration officers," from furnishing false information to obtain entry, and from committing marriage or entrepreneurship fraud to evade immigration laws. But the Rule does not limit its scope to 8 U.S.C. § 1325, instead claiming authority to review compliance with unspecified "other Federal immigration laws." 34 C.F.R. § 685.219(b)(30)(i). The Department's paltry explanation is that "[t]he phrase 'Federal immigration law' is broad, but it is easily understood and only applies to Federal law that regulates immigration." Final Rule, 90 Fed. Reg. at 48982.

*Terrorism*

92.　The Final Rule defines "substantial illegal purpose" to include "supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose

of obstructing or influencing Federal Government policy." 34 C.F.R. § 685.219(30)(ii). It further

provides that "terrorism is defined under 18 U.S.C. 2331." *Id.* § 685.219(32).

93.    The Rule adopts the definition of "terrorism" used in 18 U.S.C. § 2331. However,

it fails to offer any definition as to what constitutes "supporting" terrorism. *See* Final Rule, 90 Fed.

Reg. at 48983.

94.    Federal law already criminalizes the provision of material support to terrorists and

designated foreign terrorist organizations, *see* 18 U.S.C. § 2339(A)-(B), but the Rule does not

incorporate these existing statutes into its definition of "supporting."[3]

*Gender-affirming care*

95.    The Rule defines as a "substantial illegal purpose" "engaging in the chemical and

surgical castration or mutilation of children in violation of Federal or State law." 34 C.F.R.

§ 685.219(b)(30)(iii).

96.    The Rule defines "surgical castration or mutilation" as "surgical procedures that

attempt to transform an individual's physical appearance to align with an identity that differs from

his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy

their natural biological functions." *Id*. § 685.2199(b)(31).

97.    It defines "Chemical castration or mutilation" as "(i) The use of puberty blockers,

including GnRH agonists and other interventions, to delay the onset or progression of normally

timed puberty in an individual who does not identify as his or her sex; and (ii) The use of sex

hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an

---

[3] "Violence for the purpose of obstructing or influencing Federal Government policy" is defined as "violating any part of 18 U.S.C. 1501 *et seq.* by committing a crime of violence as defined under 18 U.S.C. 16." 34 C.F.R. § 685.219(b)(35). The Rule does not address the Supreme Court's 2018 decision holding a portion of 18 U.S.C. § 16 (upon which this definition relies) to be unconstitutional. *See Sessions v. Dimaya*, 584 U.S. 148, 175 (2018).

individual's physical appearance with an identity that differs from his or her sex." *Id.* § 685.219(b)(3).

98.     The Final Rule incorporates these definitions from Executive Order 14187, which is titled "Protecting Children from Chemical and Surgical Mutilation." The same Executive Order, through Section 8(a), threatens meritless criminal prosecutions against providers by weaponizing a statute prohibiting female genital mutilation of minors, despite the fact that gender-affirming genital surgery is not genital mutilation and despite the statute's exclusive application to "non-medical" procedures and express exceptions for medical care provided by a licensed practitioner. *See* Exec. Order No. 14,187, 90 Fed. Reg. 8771, 8772; 18 U.S.C. § 116.

99.     Two federal courts have held, in adjudicating the constitutionality of Executive Order 14187, that its directive that federal agencies "ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children" is facially discriminatory and that plaintiffs are likely to succeed on the merits in showing the directive violates the Equal Protection Clause. *See Washington v. Trump*, 768 F. Supp. 3d 1239, 1266-67 (W.D. Wash. 2025), appeal pending, No. 25-1922 (9th Cir.); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 446 n.38 (D. Md. 2025), appeal pending, No. 25-1279 (4th Cir.).

100.     By invoking the Executive Order, the Final Rule attempts to associate non-surgical gender-affirming care for minors with genital "mutilation." Lawful, state-regulated, medically appropriate and necessary gender-affirming care is not female genital mutilation under 18 U.S.C. § 116. To the extent that the Final Rule relies on 18 U.S.C. § 116 as the "Federal . . . law that prohibits sex transition," NPRM, 90 Fed. Reg. at 40159; *see* Final Rule, 90 Fed. Reg. at 48980, such reliance is ungrounded and unsupported.

101.    Gender-affirming care is health care explicitly protected by laws in many Plaintiff States and supported by overwhelming medical consensus, including the American Academy of Family Physicians, the American Academy of Pediatrics, the American College of Obstetricians and Gynecologists, the American Medical Association, the American Psychological Association, and the Pediatric Endocrine Society, among others. By attempting to associate gender-affirming care with criminal genital mutilation, the Final Rule seeks to sow fear among medical providers and employers and bully them out of providing gender-affirming care at all.

102.    Additionally, the rule incorporates Executive Order 14187's definition of "child" or "children" to mean "an individual or individuals under 19 years of age." 34 C.F.R. § 685.219(b)(4). The Department's only explanation for why a definition pertaining to children encompasses legal adults is a rote statement that Executive Order 14187 "provides the basis for the proposed definition" and an assertion that the definition will promote "uniformity" and "avoid confusion." Final Rule, 90 Fed. Reg. at 48981. But in many states, including Plaintiff States, the age of majority is eighteen years of age. As a result, the Final Rule deems the provision of gender-affirming care to legal adults as a "substantial illegal purpose."

*Child trafficking*

103.    The Final Rule defines "substantial illegal purpose" to include "[e]ngaging in the trafficking of children to another state for purposes of emancipation from their lawful parents in violation of Federal or State law." 34 C.F.R. § 685.219(b)(30)(iv).

104.    It defines "trafficking" as "transporting a child or children from their State of legal residence to another State without permission or legal consent from the parent or legal guardian for purposes of emancipation from their lawful parents or legal guardian, in violation of applicable law." 34 C.F.R. § 685.219(b)(33).

105.    Despite repeatedly elsewhere relying on federal criminal law, the Department ignores the definitions of "sex trafficking" and "human trafficking" in federal laws. *See* 18 U.S.C. § 1581 *et seq.* Instead, the Department makes up a definition out of whole cloth but provides no reasoned explanation for why it fails to follow the existing definitions, instead relying on the tautological statement that the Department will be "unable to find that an organization is engaged in trafficking if the organization's conduct does not meet the elements necessary to show that they have engaged in such unlawful conduct." Final Rule, 90 Fed. Reg. at 48983. To the extent that the Department's made-up definition is intended to target minors who travel across state lines to receive gender-affirming care or reproductive healthcare—as the President indicated in the PSLF Executive Order, 90 Fed. Reg. 11885—this provision is mere pretext for chilling lawful activities of employers who may assist these minors.

*Discrimination*

106.    The Final Rule contains within its "substantial illegal purpose" definition a prohibition on "[e]ngaging in a pattern of aiding and abetting illegal discrimination." 34 C.F.R. § 685.219(b)(30)(v). In turn, it defines "illegal discrimination" as "a violation of any Federal discrimination law including, but not limited to, the Civil Rights Act of 1964 (42 U.S.C. 1981 *et seq.*), the Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq.*)." 34 C.F.R. § 685.219(b)(12).

107.    Indeed, the Department has already tried to misuse Federal anti-discrimination law, warning education agencies and institutions against Diversity, Equity, and Inclusion initiatives. *See, e.g.*, "Dear Colleague" Letter, Feb. 14, 2025, Office of Civil Rights, Department of Education: https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf.    At    least

two federal courts have enjoined the Department from "enforcing and/or implementing" the Letter and related final agency actions. *See Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149 (D.N.H. 2025); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. CV SAG-25-628, 2025 WL 2374697 (D. Md. Aug. 14, 2025).

108.    In addition, the Department imports the criminal aiding and abetting standard in its definition of illegal discrimination. This criminal standard, which relies on an underlying criminal violation, is wholly inapplicable to federal anti-discrimination laws, as all of the listed laws in the definition are civil in nature. *See* 34 C.F.R. § 685.219(b)(12).

109.    Further, the Final Rule fails to clarify what constitutes a "pattern" of aiding and abetting illegal discrimination. *See* 34 C.F.R. § 685.219(b)(30)(v).

*State law violations*

110.    The Final Rule provides that it is a "substantial illegal purpose" to "engag[e] in a pattern of violating" State laws of "(i) Trespassing; (ii) Disorderly conduct; (iii) Public nuisance; (iv) Vandalism; or (v) Obstruction of highways." 34 C.F.R. § 685.219(b)(30)(vi), (b)(34).

111.    The Department makes no effort to explain how or why it selected this very narrow list of five offenses and offers no reasoning as to why only these particular state-level offenses warrant revoking qualified employer status. These State law violations are often misdemeanors or punishable by small fines. Yet the Department seeks to impose a disastrous and disproportionate penalty on employers: the loss of PSLF eligibility for all employees.

112.    Its justification borders on the nonsensical. According to the Department, this term "is intentionally broad and encompasses a wide array of conduct, but it is also sufficiently clear and puts employers on notice." Final Rule, 90 Fed. Reg. at 48980.

113.    Here, as well, the Final Rule fails to clarify what constitutes a "pattern" of violating these limited State laws, leaving employers to question, for example, whether two employees being separately cited for disorderly conduct would mean the organization "engag[es] in a pattern of violating State laws" under the Final Rule. 34 C.F.R. § 685.219(b)(30)(vi).

114.    By narrowly targeting a very limited number of State laws that all appear to be related to the right of assembly and protest activity, the Final Rule seeks to coerce employers into abandoning any protest activity.

115.    In sum, the Final Rule's inclusion of these six categories of "illegal purpose[s]" is pretextual. The definitions that the Department has included are intentionally vague and overreaching, threatening to sweep in a wide swath of unspecified conduct. The Final Rule is designed to create confusion and fear among employers and employees alike as to whether they will remain eligible for the PSLF program. The resulting chaos is deliberate. The Department's chosen six categories closely track this Administration's policy agenda, and their inclusion here is calculated to prevent employees from working for employers who engage in conduct that is eminently lawful but disfavored by this Administration. In addition, the Rule's vagueness will likely cause employers to hesitate or completely stop participating in *lawful* conduct, for fear it may be deemed prohibited by the Department.

116.    In attempting to justify its brazenly unlawful targeting of specific disfavored activity, the Rule erroneously states that it is invoking "broad powers of prosecutorial discretion of the executive branch." Final Rule, 90 Fed. Reg. at 48975. But a notice-and-comment final rule

is not akin to a "prosecution" in which the Department is vested with the type of discretion afforded to criminal prosecutors. The Department relies on authority from federal criminal cases that have no bearing here. *See id.* at 48975-76 (citing cases involving federal criminal prosecution). More fundamentally, this flawed defense lays bare the true purpose of the Rule: to wield the Department's authority to punish those with whom it disagrees.

**B. The Rule is Ambiguous as To What Constitutes "Activities" and a "Substantial Illegal Purpose."**

117.    The Final Rule creates considerable ambiguity regarding which activities are relevant for the determination of whether a qualifying employer has "a substantial illegal purpose." For example, it is unclear *whose* activities are relevant for determining illegality, *how much* purportedly illegal activity can disqualify an employer from PSLF, and *how central* such activities must be to the employer's purpose to affect PSLF eligibility. This ambiguity effectively grants the Department unfettered discretion to revoke employers' eligibility and prevents employers from understanding which activities will put them at risk of revocation.

118.    Critically, the Rule directs the Department to "consider[] the materiality of any illegal activities or actions" in determining that a qualifying employer has "engaged in illegal activities such that it has a substantial illegal purpose." 34 C.F.R. § 685.219(h)(1). Yet the Rule itself provides no actual guidelines, explanations, or limitations on what materiality means.

119.    Where the Department has offered descriptions of what level of activity may give rise to revocation of PSLF eligibility, it has done so merely in the preamble to the Final Rule. Furthermore, the descriptions it has offered are vague and at times inconsistent. For example, the Department suggests that an employer may be deemed to have a "substantial illegal purpose" in light of any of the following: conduct that is "more than an insubstantial portion of the employer's activities," conduct that is "central to the organization's primary mission or operations" or "a

pattern and practice [by] numerous employees." Final Rule, 90 Fed. Reg. at 48981, 48985. And although the Department has said that it will not consider incidental actions by individuals acting outside the scope of their employment, the Final Rule itself does not explicitly exclude out-of-work conduct as a basis for finding that an employer has engaged in activities that have a "substantial illegal purpose."

120.    The Department suggests the Rule might not be violated by conduct that is "incidental," "minor or isolated," or "limited." *Id.* at 48983, 489858. Yet, in at least one context, the Department has stated that "even one" instance of misconduct "*may* be sufficient," calling into question how much conduct would be enough in all other contexts. *Id.* at 48989 (emphasis added). Further, none of these limitations are articulated in the Final Rule itself. The absence of any such limitation in the text of the actual Rule raises the risk that the Department could determine that an employer—even a large employer such as a State government or government agency—is engaged in activities that have a "substantial illegal purpose" based on the conduct of just a small number of employees.

121.    The Rule also offers different formulations of what constitutes a "substantial illegal purpose." Under some formulations, it is the organization itself that must have a substantial illegal purpose, whereas under others, it is the organization's activities that must have a substantial illegal purpose. This ambiguity creates further confusion regarding how the Department will apply the Rule and what type of conduct on the part of an employer could result in a revocation of PSLF eligibility. The various formulations are also inconsistent about whether a "substantial illegal purpose" can be determined based only on *illegal* conduct or on *any* conduct. Critically, whereas the Rule and preamble refer to "illegal activities" dozens of times, in the operative definition of "qualifying employer," the Rule omits the qualifier "illegal," excluding "organizations that engage

in activities such that they have a substantial illegal purpose. . .” 34 C.F.R. § 685.219(b)(27)(ii); *see also* § 685.219(c)(4). This leaves open the troubling possibility that the Department may determine that otherwise lawful conduct could be deemed as establishing an illegal purpose.

### C. The Rule Creates Ambiguous Evidentiary Requirements and Nonexistent Notice and Response Procedures.

122.    The Rule creates ambiguous evidentiary requirements which leave no accountability for the Department's decision making.

123.    The Rule states that the Department will make its determination "by a preponderance of the evidence." 34 C.F.R. § 685.219(h)(1). But the Rule does not explain by a preponderance of *what* evidence; how the Department will collect evidence; or how or whether a targeted employer could even submit evidence on its own behalf.

124.    The Rule directs the Department to consider the following three categories as "conclusive evidence" that an entity has "engaged in activities" with a "substantial illegal purpose":

> (i) A final judgment by a State or Federal court, whereby the employer is found to have engaged in illegal activities that have a substantial illegal purpose; (ii) A plea of guilty or *nolo contendere* whereby the employer admits to have engaged in illegal activities that have a substantial illegal purpose or pleads *nolo contendere* to allegations that the employer engaged in illegal activities that have substantial illegal purpose; or (iii) A settlement that includes admission by the employer that it engaged in illegal activities that have a substantial illegal purpose described in paragraph (h) of this section.

34 C.F.R. § 685.219(h)(1).

125.    These three categories of supposedly "conclusive evidence" are not exhaustive, however, and the Department makes no attempt to explain what additional kinds of evidence it will consider in making a determination of a "substantial illegal purpose," though it reserves its right to consider other evidence. Nor does the Final Rule explain how or under what circumstances

it will gather and review evidence if none of the three forms of "conclusive evidence" exist, only stating that "the Secretary will consider any reliable evidence, including countervailing evidence provided by the employer." Final Rule, 90 Fed. Reg. at 48971.

126.    This leaves the Department with virtually unlimited discretion to pick and choose which kinds of evidence to gather and review and which employers to target. It also allows it to determine that an employer has engaged in activities that have a "substantial illegal purpose" based on exceedingly limited evidence, so long as it meets a preponderance of whatever evidence is in front of the Department at the given time.

127.    The Rule also defines a violation of State law as, in part, "a final, non-default judgment by a State court. . . ." 34 C.F.R. § 685.219(b)(34). However, as discussed immediately above, the Rule also provides for three categories of "conclusive evidence" of State law violations: (1) a final judgment in State or Federal court; (2) a guilty or nolo contendere plea, or (3) a settlement. 34 C.F.R. § 685.219(h)(1). The Department offers no reasoned explanation for the inconsistency between these two definitions for State law violations, nor how it would apply the two different standards in cases where it determined violations of State law might constitute a "substantial illegal purpose."

128.    Further, many of the definitions of "substantial illegal purpose" are criminal in nature and ordinarily are proven beyond a reasonable doubt. 34 C.F.R. § 685.219(b)(30). But the Department has no expertise in making criminal determinations and is not equipped to do so.

129.    The notice procedures provided by the Rule are also flawed in that they provide the Department with tremendous, unwarranted discretion to act without providing PSLF employers with meaningful notice or opportunity to respond.

130.    The Rule provides a fig leaf of process by providing that the Department will make a "substantial illegal purpose" determination "after notice and opportunity to respond." 34 C.F.R. § 685.219(h)(1). However, the Rule does not provide any specific details regarding the issuance of any notice to any employer; does not provide any specific details or instructions for employers on their opportunity to respond; does not state any procedures or timeline an employer must follow; and does not set any standard for the Department's review.

131.    In fact, the Department reasoned that review timelines would place an undue burden on the Department, and that unspecified "reviews and controls" would provide the same guarantees of fair treatment as actual, clearly defined review procedures. Final Rule, 90 Fed. Reg. at 48986 ("[T]he Department is unable to commit to a specific [review] timeline"); *id.* at 48987 ("The Department has internal reviews and controls in place with all agency adjudications to . . . minimize the risk of arbitrary and capricious decision-making.").

132.    Put simply, in practice, the Rule allows the Department to provide as much or as little process as it wants. It could grant the opportunity for an administrative trial, with all the trappings of process a trial entails, including the right to call witnesses, the right to cross-examine one's accusers, and the opportunity for multitudinous oral and written argument. Or, it could provide only the opportunity to respond via a truncated standard form. Both are permissible under the Final Rule.

133.    The Rule also provides that the Department may make a determination of "substantial illegal purpose" if "the employer fails to certify that it did not participate in activities that have a substantial illegal purpose." 34 C.F.R. § 685.219(i)(1)(i). This indicates that the Department intends to require all PSLF employers to affirmatively certify that they are not engaged in activities that have a "substantial illegal purpose." The Rule does not affirmatively state this

requirement anywhere, but the Department confirms in the NPRM and in discussion of the Final Rule that it will require employer certification. NPRM, 90 Fed. Reg. at 40164 ("[T]he Department would amend the PSLF Form to allow a qualifying employer to self-certify that it has not engaged in activity that has a substantial illegal purpose."); Final Rule, 90 Fed. Reg. at 48989 ("The Department agrees that it will reject individual incomplete applications where an employer fails to certify that it did not participate in activities that have a substantial illegal purpose.").

### D. The Rule Targets States While Excluding Federal Entities for No Discernable Reason.

134.    The Department "assume[s] that Federal agencies will comply with the law" and thus will not be determined to have a "substantial illegal purpose." NPRM, 90 Fed. Reg. at 40170; Final Rule, 90 Fed. Reg. at 48994. The Department provides no explanation for this bare assertion. It relies on this assumption in its impact analysis, which reflects no reduction in PSLF forgiveness for federal employees.

135.    The Department does not make the same assumption with respect to State and local governments. To the contrary, the Department is clear that States and local governments may be subject to a determination of "substantial illegal purpose." *See* NPRM, 90 Fed. Reg. at 40170; Final Rule, 90 Fed. Reg. at 48994. Plaintiff States strenuously dispute that State agencies could have a "substantial illegal purpose," but the Final Rule contemplates empowering the Department to determine otherwise.

136.    The Final Rule states that "some fields are more likely to be affected than others, either by loss of eligibility, the deterrent effect on their activities, difficulty recruiting employees, or by their employees not being granted PSLF forgiveness and seeking alternate employment. Regardless of the type of employer, service areas that could be most affected by the regulation include, but are not limited to, legal services, *governance*, social work, healthcare, *K-12 education,*

*and higher education.*" Final Rule, 90 Fed. Reg. at 48995 (emphases added); *see also* NPRM, 90 Fed. Reg. at 40170.

137.    The Department thus acknowledges that it actually expects the Final Rule to directly target and affect State governments.

138.    The Department provides no reasoned explanation for why it assumes that *federal* agencies will comply with the law while State governments will not.

139.    Further, the Department has retained for itself discretion to apply a finding that a single branch or office of a State or local government has a "substantial illegal purpose" to the State government as a whole. Whether a large employer, such as a State government, is one "qualifying employer" or multiple "qualifying employers" for PSLF purposes is typically determined by the organization's tax employment identification number (EIN). As the NPRM notes, "[f]or example, the County of Los Angeles has a single EIN covering various departments including the Los Angeles County Public Defender, Los Angeles County Department of Children and Family Services, Harbor-UCLA Medical Center, and the County of Los Angeles Fire Department. Government agencies, in particular, may have many service areas under a single EIN." NPRM, 90 Fed. Reg. at 40169.

140.    The Rule states that "the Secretary shall, in the event an employer is operating under a shared identification number or other unique identifier, consider the organization to be separate if the employer is operating separately and distinctly," but what it means to be "operating separately and distinctly" is not explained. 34 C.F.R. §685.219(i)(2). To the contrary, the Final Rule "gives the Department flexibility" to make this determination. Final Rule, 90 Fed. Reg. at 48988. The Rule leaves open the possibility that an entire State government could lose PSLF eligibility based on the Department's impression of the activities of a single State agency, or that

a State agency could lose PSLF eligibility based on the isolated activities of a few employees, depending entirely on the discretion of the Department.

141.    Finally, the Rule provides that an employer may regain eligibility after ten years or after the Secretary approves a corrective action plan. 34 C.F.R. § 685.219(j).

142.    The Department provides no justification for the ten-year ban other than the conclusory claims that "the temporal disqualification strikes the right balance and ensures that organizations can regain eligibility," Final Rule, 90 Fed. Reg. at 48990, and that "a period of 10 years would better ensure that employers do not continue to engage in behavior that has substantial illegal purpose," NPRM, 90 Fed. Reg. at 40165.

143.    If the employer instead seeks a corrective action plan, the Rule gives the Department unfettered discretion to impose "terms or conditions" that are "designed to ensure that employers do not engage in actions or activities that have a substantial illegal purpose." 34 C.F.R. § 685.219(j)(2)(iii). In practice, therefore, the Rule grants the Department incredible power to use a "substantial illegal purpose" finding as a cudgel to coerce employers to behave in a way that comports with the Administration's policy priorities.

144.    In contemplating States as potential targets for exclusion from eligible PSLF employment, the Department has failed to consider the significant reliance interests of employers, including Plaintiff States, on the PSLF program. Hundreds of thousands of borrowers are currently enrolled in the program, including thousands of employees of Plaintiff States. Those employees are performing critical work for the Plaintiff States, and commonly entered the State workforce because they knew they could rely on PSLF to alleviate their federal student loan debt burden. The Department did not take States' reliance interests into account. As to borrowers, the Rule correctly recognizes that borrowers have "significant reliance interests" but fails to appropriately consider

them. Final Rule, 90 Fed. Reg. at 48984. Instead, the Rule wrongly suggests that the "opportunity to change employers" would alleviate any harm to borrowers from the Rule. *Id.*

**VII.    The Final Rule Will Cause Harm to Plaintiff States and Their Residents Because They Rely on the PSLF Program.**

145.    Plaintiff States, as employers of thousands of PSLF-eligible employees, rely on PSLF. The program allows Plaintiff States to recruit and retain talented and educated employees, many of whom may not have chosen a lower paying career in public service were it not for PSLF. Any uncertainty regarding employer eligibility undermines the PSLF program and wreaks havoc on Plaintiff States' ability to maintain a vital workforce.

146.    Many borrowers' student loan debt constitutes a significant portion of, or even exceeds, their annual pay. Student loan debt is also a source of anxiety, stress, and depression for borrowers. Moreover, borrowers with high student loan debt are more likely to delay or forego important life milestones, such as marriage, parenthood, and home ownership.

147.    Residents and State employees have planned their lives and careers around receiving PSLF forgiveness. They have spent years in public service knowing that their service will lead to debt forgiveness after they have met the program's monthly loan payment requirements on their qualifying loans.

148.    To be clear, PSLF is not merely a convenient recruitment tool for State employers. For many employees with debt loads that reach into the tens or even hundreds of thousands of dollars, PSLF is the only reason they can afford to work in public service in the first place. Without PSLF, many State employees could not otherwise reasonably afford to pay off their student loans on a public servant's salary.

149.    The Final Rule will cause harm to Plaintiff States, their employees, and residents because it will deter student borrowers from considering public service careers for fear that the

Department will strip a future employer of its status as a qualified employer. Similarly, States will have trouble retaining talented employees who fear that the Department may seek to revoke their employer's PSLF eligibility.

150.    The Department acknowledges that "the PSLF program has been a key factor in attracting and retaining individuals in public service," but wrongheadedly asserts that the Rule "will make the program more accessible and reliable." NPRM, 90 Fed. Reg. at 40169; *see also* Final Rule, 90 Fed. Reg. at 48969 ("[T]he PSLF program makes it easier for borrowers to pursue public service careers; however, the rule is unlikely to materially alter those incentives."). To the contrary, the Final Rule will only serve to deter student borrowers from entering into public service for fear that they may, at any moment, lose PSLF eligibility based upon the whims of the Department. This will put Plaintiff States, as public service employers, at a huge disadvantage in attracting and retaining talented employees. Plaintiff States will incur harm in the form of increased recruitment and retention costs, a shrinking talent pool for State employment, and increased challenges to fulfilling the missions of critical state agencies and organizations, including public schools, law enforcement agencies, first responders, and public hospitals.

151.    The Rule expressly recognizes that it is likely to have an economic impact on large public employers, acknowledging that "[l]arger organizations, such as hospitals or universities, . . . may incur higher costs as they assess their practices and make any necessary changes to align with this final rule." Final Rule, 90 Fed. Reg. at 48993; *see also* NPRM, 90 Fed. Reg. at 40168 (similar).

152.    The Department also estimates that the Final Rule will generate "long-term savings . . . for taxpayers" in the form of "$1.616 billion over the next ten years." Final Rule, 90

Fed. Reg. at 48993. Or, put another way, the Department estimates that it will withhold over a billion dollars of PSLF forgiveness over the next decade by declaring entities ineligible for PSLF.

153.    The Department's Impact Analysis further admits that PSLF is a key consideration for borrowers when considering public service employment: "There is significant research, both academic and private sector, which documents that public service employees cited PSLF as a significant factor in their decision to pursue and remain in public service." NPRM, 90 Fed. Reg. at 40169. By the Department's own logic, threatening State employers' PSLF status will cause prospective state employees to choose other employers.

154.    The Department's Impact Analysis also acknowledges that State government entities stand to be disproportionately affected by the Final Rule. Specifically, the Department states that specific fields, including "governance," "K-12 education, and higher education," all of which include State employees, "are more likely to be affected than others, either by loss of eligibility, the deterrent effect on their activities, difficulty recruiting employees, or by their employees not being granted PSLF forgiveness and seeking alternate employment." Final Rule, 90 Fed. Reg. at 48995; *see* NPRM, 90 Fed. Reg. at 40170. Borrowers may fear spending years in public service, only to learn that they will be unable to achieve forgiveness unless they can obtain a new job with a new employer.

## CAUSES OF ACTION

### Count I
### Violation of the Administrative Procedure Act –
### Contrary to Law and in Excess of Statutory Authority

155.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

156.    The Department is an "agency" under the APA. 5 U.S.C. § 551(1).

157.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

158.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory . . . authority." 5 U.S.C. § 706(2)(C).

159.    The PSLF Statute, 20 U.S.C. § 1087e(m)(1), designates employment in a "public service job" as an eligibility criterion of the PSLF program.

160.    The PSLF Statute, 20 U.S.C. § 1087e(m)(3)(B), defines "[t]he term 'public service job'" as including "a full-time job in . . . government (excluding time served as a member of Congress)."

161.    The Final Rule permits the Department to designate as ineligible for PSLF certain "full-time job[s] in . . . government."

162.    The Final Rule is thus contrary to the PSLF Statute.

163.    Federal agencies cannot create exceptions to statutes unless they have been delegated authority to do so by Congress.

164.    Congress has not explicitly or implicitly delegated the Department authority to create the Final Rule's exceptions to PSLF eligibility for all "full-time job[s] in . . . government."

165.    The Department has no implicit residual authority to create the Final Rule's exception to PSLF eligibility for all "full-time job[s] in . . . government."

166.    The Final Rule exceeds the Department's authority because it permits the Department to designate as ineligible for PSLF certain "full-time job[s] in . . . government."

167.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Final Rule violates the APA because it is contrary to law and in excess of the Department's authority.

168.    Plaintiff States are entitled to vacatur of the Final Rule pursuant to 5 U.S.C. § 706, a stay of the Final Rule pursuant to 5 U.S.C. § 705, and a permanent injunction preventing the Final Rule's implementation.

**Count II**
**Violation of the Administrative Procedure Act –**
**Arbitrary and Capricious**

169.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

170.    The Department is an "agency" under the APA. 5 U.S.C. § 551(1).

171.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

172.    The Final Rule is arbitrary and capricious because, among other things, it relies on unreasoned, unsupported, and conflicting definitions of critical terms; imposes internally inconsistent and unexplained evidentiary and materiality standards; fails to consider the harms the Final Rule will cause to covered employers and borrowers; fails to consider the significant reliance interest of employers, including Plaintiff States; and fails to explain unreasoned distinctions between different types of government employers.

173.    Specifically, the Department's Final Rule rests upon an unreasoned and unsupported definition of "substantial illegal purpose." This definition lists a handful of activities but fails to articulate why these activities—all of which implicate the current Administration's political priorities—constitute the standard of whether an entity is engaged in a "substantial illegal purpose." The definition is pretextual and aimed at chilling the activities of government and nonprofit employers. The Final Rule also fails to appropriately consider the harms the definition's vagueness will impose on covered employers and borrowers.

174.    The Final Rule's evidentiary and materiality standards are arbitrary and capricious because they are internally inconsistent and provide the Secretary with sweeping discretion to revoke PSLF eligibility by deciding that an entity has a "substantial illegal purpose."

175.    The Final Rule's stated assumption that federal government employers will comply with the law while state and local government employees will not is arbitrary and capricious because it provides no reasoned explanation for this conclusory distinction between the federal government and all other government employers, which subjects the latter to a constant threat of losing qualified employer status.

176.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Final Rule violates the APA because it is arbitrary and capricious.

177.    Plaintiff States are entitled to vacatur of the Final Rule pursuant to 5 U.S.C. § 706, a stay of the Final Rule pursuant to 5 U.S.C. § 705, and a permanent injunction preventing the Final Rule's implementation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States pray that this Court:

i.    Issue a judicial declaration that the Final Rule is unlawful because it violates the Administrative Procedure Act;

ii.    Pursuant to 5 U.S.C. § 706, vacate the Final Rule;

iii.    Enjoin the Final Rule and its implementation as to Plaintiff States;[4]

iv.    Award the Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

v.    Grant other such relief as this Court may deem proper.

---

[4] Plaintiff States includes their instrumentalities and subdivisions.

Dated: February 10, 2026                     Respectfully submitted,

**ANDREA JOY CAMPBELL**                      **LETITIA JAMES**
 Attorney General of Massachusetts            Attorney General of New York

By: */s/ Victoria Roytenberg*                By: */s/ Jessica Ranucci*
Victoria Roytenberg, BBO No. 685283          Jessica Ranucci*
 *Assistant Attorney General*                 *Special Counsel*
Michael Turi, BBO No. 706205                 Shanna Tallarico*
 *Deputy Chief, Consumer Protection*          *Assistant Attorney General*
 *Division*                                  28 Liberty Street
Yael Shavit, BBO No. 695333                  New York, NY 10005
 *Chief, Consumer Protection Division*       (929) 736-3392
Office of the Attorney General               jessica.ranucci@ag.ny.gov
1 Ashburton Pl.                              shanna.tallarico@ag.ny.gov
Boston, MA 02108
(617) 963-2387
victoria.roytenberg@mass.gov                 *Attorneys for the State of New York*
michael.turi@mass.gov
yael.shavit@mass.gov

*Attorneys for the Commonwealth of*
*Massachusetts*

**PHILIP J. WEISER**                         **ROB BONTA**
 Attorney General of Colorado                 Attorney General for the State of
                                              California

By: */s/ Martha U. Fulford*                  By: */s/ Daniel A. Osborn*
Martha Upton Fulford*                        Nicklas A. Akers, BBO No. 671415
 *Assistant Deputy Attorney General*          *Senior Assistant Attorney General*
Sam Wolter*                                  Bernard A. Eskandari*
 *Assistant Attorney General*                  *Supervising Deputy Attorney General*
Colorado Department of Law                   Daniel A. Osborn*
1300 Broadway, #10                           Caroline E. Wilson*
Denver, CO 80203                              *Deputy Attorneys General*
720-508-6000                                 1300 I Street
Martha.fulford@coag.gov                      Sacramento, CA 95814
Samuel.wolter@coag.gov

Attorneys for the State of Colorado

Nicklas.Akers@doj.ca.gov
Bernard.Eskandari@doj.ca.gov
Daniel.Osborn@doj.ca.gov
Callie.Wilson@doj.ca.gov

*Attorneys for the People of the State of California*

**KRISTIN K. MAYES**
  Attorney General of Arizona

By: */s/ Kathryn E. Boughton*
Kathryn E. Boughton*
  *Assistant Attorney General*
Office of the Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Kathryn.Boughton@azag.gov
ACL@azag.gov

*Attorney for the State of Arizona*

**WILLIAM TONG**
  Attorney General of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold*
  *Solicitor General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.skold@ct.gov

*Attorney for the State of Connecticut*

**KATHLEEN JENNINGS**
  Attorney General of the State of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Liston*
  *Director of Impact Litigation*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**BRIAN L. SCHWALB**
  Attorney General for the District of Columbia

By: */s/ Lindsay Marks*
Lindsay Marks*
  *Assistant Attorney General*
  *Public Advocacy Division*
Office of the Attorney General
for the District of Columbia
400 6th Street, N.W., 10th Floor
Washington, D.C. 20001
(202) 724-6649
lindsay.marks@dc.gov

*Attorney for the District of Columbia*

44

**ANNE E. LOPEZ**
  Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*


**AARON M. FREY**
  Attorney General for the State of Maine

By: */s/ Christina M. Moylan*
Christina M. Moylan*
  *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145
christina.moylan@maine.gov

*Attorney for the State of Maine*


**DANA NESSEL**
  Attorney General of Michigan

By: */s/ Neil Giovanatti*

**KWAME RAOUL**
  Attorney General of Illinois

By: */s/ Katharine Roller*
Katharine Roller*
  *Complex Litigation Counsel*
Sarah J. Gallo*
  *Ethics Unit Supervisor*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 519-1842
Katharine.roller@ilag.gov
Sarah.gallo@ilag.gov

*Attorneys for the State of Illinois*


**ANTHONY G. BROWN**
  Attorney General of Maryland

By: */s/ Keith M. Jamieson*
Keith M. Jamieson*
  *Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6960
kjamieson@oag.state.md.us

*Attorney for the State of Maryland*


**KEITH ELLISON**
  Attorney General of Minnesota

By: */s/ Adam Welle*

45

Neil Giovanatti*
Daniel Ping*
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
PingD@michigan.gov

*Attorneys for the State of Michigan*

Adam Welle*
  *Assistant Attorney General*
445 Minnesota Street, Suite 800
St. Paul, MN 55101
(651) 757-1425
Adam.welle@ag.state.mn.us

*Attorney for the State of Minnesota*


**AARON D. FORD**
  Attorney General of Nevada

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland*
  *Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Attorney for the State of Nevada*

**JENNIFER DAVENPORT**
  Acting Attorney General of New Jersey

By: */s/ Andrew H. Yang*
Andrew H. Yang**
  *Deputy Attorney General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5278
Andrew.Yang@law.njoag.gov

*Attorneys for the State of New Jersey*


**RAÚL TORREZ**
  Attorney General of the State of New
  Mexico

By: */s/ Olivia den Dulk*
Olivia den Dulk*
  *Assistant Attorney General*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
505-270-4332
odendulk@nmdoj.gov

**DAN RAYFIELD**
  Attorney General of Oregon

By: */s/ Leanne Hartmann*
Leanne Hartmann, BBO #667852
  *Senior Assistant Attorney General*
Kate E. Morrow*
  *Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880

46

*Attorney for the State of New Mexico*

Fax (971) 673-5000
Leanne.Hartmann@doj.oregon.gov
Kate.E.Morrow@doj.oregon.gov

*Attorneys for the State of Oregon*

**PETER F. NERONHA**
  Attorney General of Rhode Island

By: */s/ Chandana Pandurangi*
Chandana Pandurangi*
  *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2806
cpandurangi@riag.ri.gov

*Attorney for the State of Rhode Island*

**CHARITY R. CLARK**
  Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane*
  *Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

*Attorney for the State of Vermont*

**JAY JONES**
  Attorney General of Virginia

By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge**
 *Solicitor General*
Mikaela A. Phillips**
 *Assistant Solicitor General*
Office of the Attorney General
202 N. 9th Street
Richmond, Virginia 23219
Tel: (804) 786-2071
Fax: (804) 786-1991
solicitorgeneral@oag.state.va.us
mphillips@oag.state.va.us

*Attorneys for the Commonwealth of
Virginia*

**NICHOLAS W. BROWN**
  Attorney General of Washington

By: */s/ Erica R. Franklin*
Erica R. Franklin*
Julia Doyle*
  *Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
Erica.Franklin@atg.wa.gov
Julie.Doyle@atg.wa.gov

*Attorneys for the State of Washington*

**JOSHUA L. KAUL**
  Attorney General of Wisconsin
By: */s/ Samuel T. Ward-Packard*
Samuel T. Ward-Packard*
  *Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8938
samuel.ward-packard@wisdoj.gov

*Attorney for Plaintiff State of Wisconsin*


\* *Admitted pro hac vice*
\*\* *Pro hac vice forthcoming*