**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS; STATE OF NEW YORK; STATE OF COLORADO; PEOPLE OF THE STATE OF CALIFORNIA; STATE OF ARIZONA; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF HAWAIʻI; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; and STATE OF WISCONSIN, | Case No. 1:25-cv-13244 <br><br> Leave to file excess pages granted on January 27, 2026 |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF EDUCATION and LINDA McMAHON, in her official capacity as SECRETARY OF THE U.S. DEPARTMENT OF EDUCATION, | |
| Defendants. | |

**PLAINTIFF STATES' MEMORANDUM**

**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................................ii

TABLE OF AUTHORITIES ...........................................................................................................iii

INTRODUCTION ...........................................................................................................................1

BACKGROUND .............................................................................................................................1

    I.    The Public Service Loan Forgiveness Program .....................................................................1

    II.   The Executive Order and Rulemaking.................................................................................3

    III.  The Rule...............................................................................................................................5

    IV.  Procedural History ..............................................................................................................7

LEGAL STANDARD .....................................................................................................................8

ARGUMENT ..................................................................................................................................8

    I.    The Court Has Jurisdiction. .................................................................................................8

       A.   Plaintiffs Have Standing. ...............................................................................................8

       B.   Plaintiffs' Claims Are Ripe. ...........................................................................................9

    II.   The Final Rule Violates the Administrative Procedure Act. ..............................................11

       A.   The Final Rule is Contrary to Law and Exceeds Statutory Authority. ..........................11

          1.    The Rule Contradicts the Plain Language of the PSLF Statute...............................12

          2.    Congress Did Not Delegate to ED the Authority to Promulgate the Final Rule. .................14

          3.    Other Interpretive Tools Confirm ED Lacks Authority to Promulgate the Rule..................17

          4.    ED Has No Valid Authority for Promulgating the Rule. .........................................18

             i.    ED Cannot Rely on General Rulemaking Authority or Congressional Purpose...............18

             ii.   ED Cannot Rely On the "Illegality Doctrine" as a Source of Authority. .........................19

             iii.  ED Cannot Rely on Any Inherent Authority to Promulgate the Rule..............................20

       B.   The Rule is Arbitrary and Capricious. ..........................................................................21

          1.    No Rational Connection Exists Between the Rule and ED's Justification............................22

          2.    The Rule Inexplicably Targets State Employers While Ignoring Federal Employers...........26

          3.    The Rule's Terms Are Vague and Unsupported...................................................27

          4.    The Rule is Ambiguous So Employers Will Not Know Their Legal Obligations.................31

          5.    Defendants Failed to Account for Reliance Interests. ..........................................33

    III.  The Final Rule Should Be Vacated. ..................................................................................34

CONCLUSION..............................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alabama Power Co. v. Costle*,
636 F.2d 323 (D.C. Cir. 1979) ............................................................................. 13

*Am. Ass'n of Univ. Professors v. Rubio*,
802 F. Supp. 3d 120 (D. Mass. 2025) ................................................................... 24

*Am. Bar Ass'n v. FTC*,
430 F.3d 457 (D.C. Cir. 2005) ......................................................................... 15-16

*Am. Pub. Health Ass'n v. Nat'l Institutes of Health*,
791 F. Supp. 3d 119 (D. Mass. 2025) ............................................................. 25, 28

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*,
273 F.3d 1229 (9th Cir. 2001) ......................................................................... 27-28

*Asociacion Hosp. Del Maestro, Inc. v. Becerra*,
10 F.4th 11 (1st Cir. 2021) ................................................................................... 14

*Bais Yaakov of Spring Valley v. ACT, Inc.*,
12 F.4th 81 (1st Cir. 2021) ................................................................................... 17

*Bondi v. VanDerStok*,
604 U.S. 458 (2025) ............................................................................................. 17

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
838 F.3d 42 (1st Cir. 2016) .................................................................................... 8

*Brown v. Gardner*,
513 U.S. 115 (1994) ............................................................................................. 16

*Burgess v. United States*,
553 U.S. 124 (2008) ............................................................................................. 13

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ............................................................................................. 27

*Cent. United Life Ins. Co. v. Burwell*,
827 F.3d 70 .......................................................................................... 14, 16-17, 19

*Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*,
971 F.3d 340 (D.C. Cir. 2020) ............................................................................. 12

*City of Providence v. Barr,*
    954 F.3d 23 (1st Cir. 2020) .................................................................................... 11, 16

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n,*
    466 F.3d 134 (D.C. Cir. 2006) ................................................................................ 18-19

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
    603 U.S. 799 (2024) ...................................................................................................... 34

*CoxCom, Inc. v. Chaffee,*
    536 F.3d 101 (1st Cir. 2008) .......................................................................................... 9

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.,*
    422 F. Supp. 2d 1115 (N.D. Cal. 2006) ....................................................................... 26

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) ...................................................................................................... 22

*Digital Realty Tr., Inc. v. Somers,*
    583 U.S. 149 (2018) ...................................................................................................... 13

*Duffus v. MaineHealth,*
    791 F. Supp. 3d 61 (D. Me. 2025) ......................................................................... 13, 16

*Ernst & Young v. Depositors Econ. Prot. Corp.,*
    45 F.3d 530 (1st Cir. 1995) .......................................................................................... 34

*Ethyl Corp. v. E.P.A.,*
    51 F.3d 1053 (D.C. Cir. 1995) ...................................................................................... 16

*F.C.C. v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ...................................................................................................... 33

*FCC v. Consumers' Rsch.,*
    606 U.S. 656 (2025) ...................................................................................................... 18

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ...................................................................................................... 21

*HTH Corp. v. NLRB,*
    823 F.3d 668 (D.C. Cir. 2016) ...................................................................................... 21

*In re Evenflo Co., Inc., Marketing, Sales Practices and Prods. Liab. Litig.,*
    54 F.4th 28 (1st Cir. 2022) .............................................................................................. 9

*In re Lazarus,*
    478 F.3d 12 .................................................................................................................... 16

*Jordan v. Sec'y of Educ.*,
   194 F.3d 169 (D.C. Cir. 1999)........................................................................... 16, 19

*Littlefield v. U.S. Dep't of the Interior*,
   85 F.4th 635 (1st Cir. 2023) ........................................................................... 23

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ........................................................................... 15, 21

*Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*,
   496 F. Supp. 3d 600 (D. Mass. 2020) ........................................................................... 11

*Mass. v. Nat'l Institutes of Health*,
   770 F. Supp. 3d 277 (D. Mass. 2025) ........................................................................... 34

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) ........................................................................... 9

*Merck & Co. v. U.S. Dep't of Health & Hum. Servs.*,
   385 F. Supp. 3d 81 (D.D.C. 2019)...........................................................................17-18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
   463 U.S. 29 (1983) ........................................................................... 22

*Murthy v. Missouri*,
   603 U.S. 43 (2024) ........................................................................... 8

*N.H. Lottery Comm'n v. Rosen*,
   986 F.3d 38 (1st Cir. 2021) ...........................................................................10-11

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
   763 F. Supp. 3d 36 (D.D.C. 2025)........................................................................... 25

*New York v. EPA*,
   413 F.3d 3 (2005) ........................................................................... 13

*Ohio v. EPA*,
   603 U.S. 279 (2024) ...........................................................................21-22

*Public Citizen v. FTC*,
   869 F.2d 1541 (D.C. Cir. 1989)........................................................................... 13

*Public Citizen v. Shalala*,
   932 F. Supp. 13 (D.D.C. 1996)........................................................................... 13

*Public Citizen v. Young*,
   831 F.2d 1108 (D.C. Cir. 1987)........................................................................... 13

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ............................................................................................ 18

*Ryan v. U.S. Immigr. & Customs Enf't*,
    974 F.3d 9 (1st Cir. 2020) .............................................................. 11-12, 14, 18, 20

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ................................................................ 23

*Santana v. Holder*,
    731 F.3d 50 (1st Cir. 2013) ........................................................................... 13, 15

*SAS Inst., v. Iancu*,
    584 U.S. 357 (2018) ...............................................................................12-13, 16-17

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
    123 F.4th 1 (1st Cir. 2024) ................................................................................... 9

*Shays v. Fed. Election Comm'n*,
    414 F.3d 76 (D.C. Cir. 2005) .............................................................................. 13

*Sierra Club v. EPA*,
    129 F.3d 137 (D.C. Cir. 1997) ............................................................................ 13

*Sierra Club v. EPA*,
    294 F.3d 155 (D.C. Cir. 2002) ...................................................................... 13, 19

*Sierra Club v. EPA*,
    719 F.2d 436 (D.C. Cir. 1983) ............................................................................ 13

*State Nat. Bank of Big Spring v. Lew*,
    795 F.3d 48 (D.C. Cir. 2015) ............................................................................... 9

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ......................................................................................10-11

*Sutherland v. Peterson's Oil Serv., Inc.*,
    126 F.4th 728 (1st Cir. 2025) .............................................................................. 15

*Tanzin v. Tanvir*,
    592 U.S. 43 (2020) .............................................................................................. 13

*U.S. v. Raymond*,
    No. CR 21-380 (CKK), 2023 WL 7005345 (D.D.C. Oct. 24, 2023).................... 12

*Van Buren v. United States*,
    593 U.S. 374 (2021) ............................................................................................ 17

*Virginia v. Am. Booksellers Ass'n, Inc.*,
    484 U.S. 383 (1988) ................................................................................................ 10

*W. Minnesota Mun. Power Agency v. FERC*,
    806 F.3d 588 (D.C. Cir. 2015) ............................................................................... 13

*W. Virginia v. EPA*,
    597 U.S. 697 (2022) ..........................................................................................17-18

*Waterkeeper All. v. Env't Prot. Agency*,
    853 F.3d 527 (D.C. Cir. 2017) .......................................................................... 13, 15

*Zimmerman v. Cambridge Credit Counseling Corp.*,
    409 F.3d 473 (1st Cir. 2005) .................................................................................. 20

**Federal Statutes**

5 U.S.C.
    § 551 ....................................................................................................................... 11
    § 704 ....................................................................................................................... 11
    § 706 ................................................................................................................... 8, 34

8 U.S.C.
    § 1189 ..................................................................................................................... 28
    § 1229a ...............................................................................................................13-14
    § 1325 ....................................................................................................................... 3

18 U.S.C.
    § 2 .......................................................................................................................... 27
    § 116 ................................................................................................................. 25, 31
    § 2331 ..................................................................................................................... 28
    § 2339 ..................................................................................................................... 28
    § 3063 ..................................................................................................................... 21
    § 1591 ..................................................................................................................... 29

20 U.S.C.
    § 1087e ............................................................................................................*passim*
    § 1089 ....................................................................................................................... 5
    § 1091 ..................................................................................................................... 17
    § 1098a ..................................................................................................................... 3
    § 1221e-3 ................................................................................................................ 18

26 U.S.C.
    § 170 ....................................................................................................................... 19
    § 501 ...................................................................................................................19-20
    § 7608 ..................................................................................................................... 21

29 U.S.C.
    § 621 ................................................................................................................................ 30

42 U.S.C.
    § 1320a-7 ........................................................................................................................ 21
    § 1981 .............................................................................................................................. 30
    § 12101 ............................................................................................................................ 30

**Federal Regulations**

34 C.F.R.
    § 685.219 ................................................................................................................... *passim*

William D. Ford Direct Loan (Direct Loan) Program, 90 Fed. Reg. 40154 (Aug. 18, 2025) ............. *passim*

William D. Ford Direct Loan (Direct Loan) Program, 90 Fed. Reg. 48966 (Oct. 31, 2025) .............. *passim*

**Executive Orders**

Executive Order 14151, 90 Fed. Reg. 8339, "Ending Radical and Wasteful Government DEI
    Programs and Preferencing", January 20, 2025 ................................................................ 24

Executive Order 14159, 90 Fed. Reg. 8443, "Protecting the American People Against Invasion",
    January 20, 2025 ............................................................................................................... 24

Executive Order 14160, 90 Fed. Reg. 8449, "Protecting the Meaning and Value of American
    Citizenship", January 20, 2025 ......................................................................................... 24

Executive Order 14161, 90 Fed. Reg. 8451, "Protecting the United States From Foreign Terrorists
    and Other National Security and Public Safety Threats", January 20, 2025 ........................ 24

Executive Order 14163, 90 Fed. Reg. 8459, "Realigning the United States Refugee Admissions
    Program", January 20, 2025 .............................................................................................. 24

Executive Order 14165, 90 Fed. Reg. 8467, "Securing Our Borders", January 20, 2025 .......................... 24

Executive Order 14168, 90 Fed. Reg. 8615, "Defending Women From Gender Ideology
    Extremism and Restoring Biological Truth to the Federal Government," January 20, 2025 .............. 24

Executive Order 14173, 90 Fed. Reg. 8633, "Ending Illegal Discrimination and Restoring Merit-
    Based Opportunity," Jan. 21, 2025 ............................................................................... 24, 30

Executive Order 14187, 90 Fed. Reg. 8771, "Protecting Children From Chemical and Surgical
    Mutilation", January 28, 2025 ...................................................................................... 25, 31

Executive Order 14235, 90 Fed. Reg. 11885, "Restoring Public Loan Forgiveness", March 7,
    2025 ...................................................................................................................... 3-5, 10, 29

**Rules**

Fed. R. Civ. P. 56 ...................................................................................................... 8

**Miscellaneous Authorities**

153 Cong. Rec. S1245 (daily ed. Sept. 7, 2007) ..................................................... 2

153 Cong. Rec. H7544 (daily ed. July 11, 2007) ................................................... 2

153 Cong. Rec. S9448 ............................................................................................. 17

153 Cong. Rec. S9461 ............................................................................................. 17

H.R. 2669 § 142. ..................................................................................................... 17

## INTRODUCTION

In 2007, Congress created the Public Service Loan Forgiveness (PSLF) program, which has provided over one million public service workers, including police officers, firefighters, military personnel, teachers, nurses, and social workers, more than $85 billion in federal student loan forgiveness. PSLF has yielded tremendous benefits to employers, including Plaintiff States, by allowing them to recruit and retain educated employees committed to public service.

Since the PSLF Statute was enacted, the PSLF Regulation has rightfully adhered to the mandate set out by Congress, which provides that *all* government jobs are PSLF-eligible, with the sole exception of members of Congress themselves. 20 U.S.C. § 1087e(m)(3). The status quo changed when the Department of Education ("ED") promulgated the Final Rule at issue in this case, which allows ED to strip eligibility for PSLF from public service workers by designating their employers, including State governments, as having a "substantial illegal purpose." In so doing, ED weaponizes PSLF to target groups and initiatives that this Administration disfavors.

Defendants' Final Rule contravenes the PSLF Statute, which provides no authority for ED to create exceptions to PSLF eligibility. The Rule is thus contrary to law and in excess of Defendants' authority, in violation of the Administrative Procedure Act ("APA"). The Rule is also arbitrary and capricious in violation of the APA, as there is no rational connection between the Rule itself and the justification that ED provides. The Court should grant Plaintiffs' Motion for Summary Judgment, vacate the Final Rule, and declare it unlawful. Absent court intervention, the Rule will become effective on July 1.

## BACKGROUND

### I.    The Public Service Loan Forgiveness Program

Congress enacted the PSLF program in 2007, recognizing that student debt often prevented people from pursuing public service careers. The PSLF program was a bipartisan effort designed

to allow students "to pursue a career in public service and be able to take those jobs . . . often at lower pay . . ." and "relieve themselves of the huge burden of debt they face." 153 Cong. Rec. S 1245 (daily ed. Sept. 7, 2007) (statement of Sen. Sherrod Brown) (cleaned up). Plaintiff States, as employers, have stood as some of the most prominent beneficiaries of the program. PSLF was intended to "encourage and enable graduates to go into the public service fields they're interested in . . . by providing loan forgiveness for first responders, early childhood educators, librarians, nurses, public defenders, and public prosecutors." 153 Cong. Rec. H7544 (daily ed. July 11, 2007) (statement of Rep. Jane Schakowsky).

20 U.S.C. § 1087e(m) ("the PSLF Statute") provides that ED "shall cancel the balance of interest and principal due" on any Federal Direct Loan of a borrower who has made 120 monthly payments under qualifying payment plans and "has been employed in a public service job during the period in which the borrower makes each of the 120 payments." 20 U.S.C. § 1087e(m)(1). The PSLF Statute, in relevant part, defines "public service job" to mean:

> (i) a full-time job in emergency management, **government (excluding time served as a member of Congress)**, military service, public safety, law enforcement, public health (including nurses, nurse practitioners, nurses in a clinical setting, and full-time professionals engaged in health care practitioner occupations and health care support occupations, as such terms are defined by the Bureau of Labor Statistics), public education, social work in a public child or family service agency, public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization), early childhood education (including licensed or regulated childcare, Head Start, and State funded prekindergarten), public service for individuals with disabilities, public service for the elderly, public library sciences, school-based library sciences and other school-based services, or at an organization that is described in section 501(c)(3) of Title 26 and exempt from taxation under section 501(a) of such title[.]

20 U.S.C. § 1087e(m)(3)(B)(i) (emphasis added).

In 2008, ED first promulgated 34 C.F.R. § 685.219 (the "PSLF Regulation"). The currently-applicable PSLF Regulation uses the defined term "qualifying employer" to set forth the

employers whose employees can be eligible for PSLF. The defined term "qualifying employer" includes "[a] United States-based Federal, State, local, or Tribal government organization, agency, or entity, including the U.S. Armed Forces or the National Guard." 34 C.F.R. § 685.219. Every version of the PSLF Regulation has maintained very similar language that defines Federal, State, local, or Tribal government organizations, agencies, or entities as eligible employers for PSLF, consistent with the PSLF Statute's definition of "public service job" as including "a full-time job in . . . government (excluding time served as a member of Congress)." 20 U.S.C. § 1087e(m)(3)(B).

## II.    The Executive Order and Rulemaking

On March 7, 2025, President Trump signed Executive Order 14235 ("PSLF EO"), titled "Restoring Public Loan Forgiveness," which erroneously asserted that "the PSLF Program has misdirected tax dollars into activist organizations that not only fail to serve the public interest, but actually harm our national security and American values[.]" 90 Fed. Reg. 11885 (March 7, 2025). The PSLF EO directed ED to revise the PSLF Regulation to "ensure the definition of 'public service' excludes organizations that engage in activities that have a substantial illegal purpose, including": "aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws"; "supporting terrorism"; "child abuse, including the chemical and surgical castration or mutilation of children or the trafficking of children to so-called transgender sanctuary States . . ."; "engaging in a pattern of aiding and abetting illegal discrimination"; and "engaging in a pattern of violating State tort laws including laws against trespassing, disorderly conduct, public nuisance, vandalism, and obstruction of highways." *Id.*

After holding a negotiated rulemaking session (which is required by statute, *see* 20 U.S.C. § 1098a(b)), ED published a Notice of Proposed Rulemaking ("NPRM") on August 18, 2025. William D. Ford Direct Loan (Direct Loan) Program, 90 Fed. Reg. 40154 (Aug. 18, 2025). The

NPRM hewed to the terms of the PSLF EO, allowing ED to designate employers as having a "substantial illegal purpose," rendering them ineligible for PSLF, and specifying six specific categories of conduct that qualify as a "substantial illegal purpose." *Id.*

Thousands of comments were submitted to ED from entities ranging from faith-based organizations to local governments, public and private schools from elementary schools to institutions of higher education, legal aid organizations, mental health providers, and hundreds of private citizens. A coalition of state Attorneys General, including many of the Plaintiff States, submitted a comment.[1] Many of these commenters raised concerns that ED's motives in proposing the Rule were pretextual; that the Rule ignored significant reliance interests; that it would deter prospective public services; and that it was vague and overly broad. Employers raised concern that the uncertainty the Rule creates will deter public service workers from remaining in or entering the public service workforce. Employers also commented on existing challenges of recruitment and retention of qualified workers, emphasizing the risk that this Rule would further undermine their organizations' ability to recruit and retain workers and thus inhibit their ability to meet the needs of their communities. Many individuals commented that without PSLF they could never have afforded to work in public service. Finally, many individuals stated that it was unfair to punish student loan borrowers for the alleged illegal activity of their employer, and that their future and livelihoods should not be subject to political gamesmanship.

---

[1] The States' comment is available online at regulations.gov and is listed in the index filed with the Administrative Record. Coalition of 22 Attorneys General, Comment Letter (Sept. 17, 2025), Doc No. 86-1 at 4 (Index Doc No. 30, spreadsheet row 9642), https://downloads.regulations.gov/ED-2025-OPE-0016-8989/attachment_1.pdf.

### III.    The Rule

On October 31, 2025, ED published the Final Rule that is the subject of this lawsuit. William D. Ford Direct Loan (Direct Loan) Program, 90 Fed. Reg. 48966 (Oct. 31, 2025) ("Final Rule" or "Rule"). Absent court intervention, the Final Rule will become effective on July 1, 2026. *See* 20 U.S.C. § 1089(c)(1). The primary substantive change made to the existing regulation by the Rule is to amend the regulatory definition of "qualifying employer" to exclude entities that have a "substantial illegal purpose," and thus to exclude borrowers who work for those entities from receiving PSLF. Specifically, the Rule adds a new subsection (ii) to the definition of "qualifying employer," italicized below, so that term is defined in the Rule as:

> (i)(A) A United States-based Federal, State, local, or Tribal government organization, agency, or entity, including the U.S. Armed Forces or the National Guard;
> (B) A public child or family service agency;
> (C) An organization under Section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under Section 501(a) of the Internal Revenue Code;
> (D) A Tribal college or university; or
> (E) A nonprofit organization that—
> > (1) Provides a non-governmental public service as defined in this section, attested to by the employer on a form approved by the Secretary; and
> > (2) Is not a business organized for profit, a labor union, or a partisan political organization; and
> *(ii) Does not include organizations that engage in activities such that they have a substantial illegal purpose, as defined in this section.*

34 C.F.R. § 685.219(b)(27) (emphasis added).[2]

The Rule defines "substantial illegal purpose" as six specific categories of conduct, which are very similar to the categories set forth in the PSLF EO:

> (i) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;
> (ii) Supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189,

---

[2] All citations to the Rule referring to provisions of the PSLF Regulation cite to the provision of the C.F.R. where the Rule will be codified upon its effective date.

or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

(iii) Engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law;

(iv) Engaging in the trafficking of children to another State for purposes of emancipation from their lawful parents in violation of Federal or State law;

(v) Engaging in a pattern of aiding and abetting illegal discrimination; or

(vi) Engaging in a pattern of violating State laws as defined in paragraph (b)(34) of this section.

34 C.F.R. § 685.219(b)(30). Many of the terms within this definition, such as "chemical castration or mutilation" and "violating State law," are separately defined in the Rule. 34 C.F.R. §§ 685.219(b)(3), (34); *see also infra* Section II.B.3.

The Rule purports to authorize ED to determine that a qualifying employer has a "substantial illegal purpose." 34 C.F.R. § 685.219(h)(1). Per the Rule, ED makes that determination "by a preponderance of the evidence" and "considering the materiality of any illegal activities or actions." 34 C.F.R. §§ 685.219(h)(1), (i)(1)(ii). The Rule also directs ED to consider three categories as "conclusive evidence" that an entity has engaged in activities with a "substantial illegal purpose": (1) a "final judgment by a State or Federal court"; (2) "[a] plea of guilty or *nolo contendere*"; and (3) "[a] settlement that includes admission by the employer that it engaged in illegal activities that have a substantial illegal purpose." 34 C.F.R. § 685.219(h)(1). However, ED is not limited to these three evidentiary categories. *Id.*

The Rule states that ED will make its determination "after notice and opportunity to respond." 34 C.F.R. § 685.219(h)(1). The Rule provides that ED may, alternatively, make this determination if "the employer fails to certify that it did not participate in activities that have a substantial illegal purpose." 34 C.F.R. § 685.219(i)(1)(i). The Rule states "in the event an employer is operating under a shared identification number or other unique identifier," *i.e.*, employment

identification number for tax purposes, ED shall "consider the organization to be separate if the employer is operating separately and distinctly." 34 C.F.R. §685.219(i)(2).

After ED has deemed a borrower's employer to have a "substantial illegal purpose," the borrower's employment and federal loan payments are no longer eligible for PSLF. 34 C.F.R. § 685.219(c)(4). The Rule provides "no recourse for a borrower" in this situation, "as the employer, not the borrower, is the entity that has not met the eligibility requirements for the PSLF program." NPRM, 90 Fed. Reg. at 40163; 34 C.F.R. § 685.219(g)(7) (stating no reconsideration process is available to borrowers). An employer may regain eligibility after ten years or after the Secretary approves a corrective action plan. 34 C.F.R. § 685.219(j).

## IV.    Procedural History

On November 3, 2025, Plaintiffs filed this action. On the same day, a group of non-State entities filed a lawsuit in this District challenging the Rule, *National Council of Nonprofits et al. v. McMahon et al*, No. 25-cv-13242, which Plaintiffs designated as a related case.[3] On December 11, 2025, the Court ordered a briefing schedule for cross-motions for summary judgment that was agreed upon by all parties in both related cases. Doc No. 82. On February 10, 2026, Plaintiffs filed an Amended Complaint.[4]

---

[3] A separate group of non-State entities have filed a challenge to the Rule in the United States District Court for the District of Columbia, *Robert F. Kennedy Center for Justice and Human Rights et al. v. McMahon et al.*, No. 25-cv-3860 (D.D.C.), which is proceeding to cross-motions for summary judgment on a similar schedule.

[4] The sole amendments to this First Amended Complaint are those necessary to facilitate the inclusion of the Commonwealth of Virginia as a plaintiff. *See* Doc No. 92 at ¶¶ 29, 52. Plaintiffs conferred with Defendants prior to filing the Amended Complaint to confirm Plaintiffs' view that this non-substantive amendment did not warrant any modifications to the agreed-upon and so-ordered briefing schedule.

**LEGAL STANDARD**

The APA requires that a court should "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction." 5 U.S.C. § 706. A court shall grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But in cases involving review of agency action under the APA, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review," and such claims are resolved on summary judgment based on the agency record. *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). Here, the parties raise no genuine dispute as to any material facts and so the entire case is ripe for disposition on the merits.

**ARGUMENT**

**I.    The Court Has Jurisdiction.**

**A.  Plaintiffs Have Standing.**

Plaintiffs have Article III standing to seek relief because they have "suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (cleaned up). Plaintiffs, as public service employers, face imminent harm from the Rule, as the Rule will harm their ability to recruit and retain educated state employees and diminish the talent pool for public service employment. As Defendants acknowledge, "significant research" shows that public service employees rely upon PSLF "as a significant factor in their decision to pursue and remain in public service." NPRM, 90 Fed. Reg. at 41069. Threatening Plaintiffs' status as PSLF employers harms them by eliminating this critical recruitment tool and dissuading potential employees from pursuing public service employment, forcing Plaintiffs to incur higher costs to attract quality

employees. Similarly, the Rule will harm Plaintiffs by threatening the PSLF eligibility of thousands of Plaintiffs' current employees, at least some of whom will be compelled to seek higher-paying employment due to the risk that Plaintiffs will no longer be eligible employers. Defendants admit this: they state that employers in the field of "governance," and "K-12 education, and higher education," all of which include state employees, "are more likely to be affected than others, either by loss of eligibility . . . difficulty recruiting employees, or by their employees not being granted PSLF forgiveness and seeking alternate employment." Final Rule, 90 Fed. Reg. at 48995; *see* NPRM, 90 Fed. Reg. at 40170. This type of "particularized future economic injury" establishes a basis for standing. *CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 107 (1st Cir. 2008) (cleaned up).

Plaintiffs would not face this harm but for Defendants' promulgation of the Rule, and vacating it would redress their injuries. Plaintiffs satisfy the traceability and redressability requirements for Article III standing. *See In re Evenflo Co., Inc., Marketing, Sales Practices and Prods. Liab. Litig.*, 54 F.4th 28, 34 (1st Cir. 2022). Plaintiffs' claims fall within the "zone of interests to be protected or regulated by the underlying statute" as required for APA claimants, since Plaintiff States are employers subject to the Rule, as Congress defined "government" employment as a "public service job" eligible for loan forgiveness. 20 U.S.C. § 1087e(m)(3)(B). *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1, 20 (1st Cir. 2024) (This test "is not especially demanding.") (cleaned up).

### B. Plaintiffs' Claims Are Ripe.

"[W]here threatened action by *government* is concerned," a plaintiff need not "expose [itself] to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). Rather, "[t]he Supreme Court [has] ruled that affected parties could challenge agency regulations in pre-enforcement suits." *State Nat. Bank of*

*Big Spring v. Lew*, 795 F.3d 48, 54 (D.C. Cir. 2015) (Kavanaugh, J.) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–53 (1967)). "In the pre-enforcement context . . . the doctrines of standing and ripeness tend to overlap." *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 52 (1st Cir. 2021). To determine whether it has jurisdiction over a pre-enforcement challenge, a Court assesses: (1) whether "the threatened enforcement of a law . . . suffice[s] as an imminent Article III injury in fact," which turns on "how clear the threat of prosecution" is, *id.* at 50; (2) "fitness," which turns on "the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed," *id.* at 52–53; and (3) "hardship," which turns on "whether the challenged action creates a direct and immediate dilemma for the parties," *id.* at 53 (cleaned up in all). All three factors confirm that Plaintiffs' challenge is ripe for resolution here.

First, there is a "clear" threat of enforcement of the Rule against Plaintiff States that "suffice[s] as an imminent Article III injury in fact." *N.H. Lottery Comm'n*, 986 F.3d at 50 (cleaned up). The Rule is "aimed directly at plaintiffs," who rely on PSLF to attract qualified employees for public service and engage in lawful conduct that could nonetheless be deemed as having a "substantial illegal purpose" under Defendants' ambiguous definitions. *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988). The threat of enforcement comes not only from the text of the Rule, but also from the President, who ordered the Secretary of Education to revise the PSLF Regulation after baselessly claiming that the PSLF program funds organizations that "harm our national security and American values." PSLF EO, 90 Fed. Reg. 11885. Given this, the prospect of future enforcement pursuant to the Rule, specifically directed by the President, is not "imaginary or speculative." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165 (2014) (cleaned up); *cf. Am. Booksellers Ass'n*, 484 U.S. at 393 ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."); Doc No. 92 at ¶ 89.

10

Second, Plaintiffs' challenge does not "depend[] upon facts" that are "not yet . . . sufficiently developed." *N.H. Lottery Comm'n*, 986 F.3d at 52 (cleaned up). To the contrary, the issues here are "purely legal, and will not be clarified by further factual development." *Susan B. Anthony List*, 573 U.S. at 167 (cleaned up). This type of challenge "is presumptively reviewable, *i.e.*, ripe." *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 609609 (D. Mass. 2020) (cleaned up).

Third, the Rule "creates a direct and immediate dilemma for" Plaintiff States and their prospective and current employees. *N.H. Lottery Comm'n*, 986 F.3d at 53 (cleaned up). Their employees must decide, now, whether the risk of losing PSLF status militates foregoing or leaving employment with Plaintiff States. And Plaintiff States must consider the risk of "openly engaging in" the conduct this Rule purports to proscribe, including at least some conduct that Defendants may assert is disqualifying under the Rule but that is nonetheless legal in Plaintiff States. *Id.* at 51. Plaintiffs "face immediate hardship if the court were to withhold review." *Mass. Fair Hous. Ctr.*, 496 F. Supp. 3d at 609.[5]

## II.    The Final Rule Violates the Administrative Procedure Act.

### A.  The Final Rule is Contrary to Law and Exceeds Statutory Authority.

"It is a bedrock principle that the power of an executive agency administering a federal statute is authoritatively prescribed by Congress." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 19 (1st Cir. 2020) (cleaned up). "[A]n agency literally has no power to act unless and until Congress confers power upon it." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (cleaned up). The Rule is straightforwardly contrary to law because it contradicts the plain

---

[5] There can be no dispute that the Final Rule is final agency action and reviewable under the APA, since agency action is defined by statute to include agency rules. 5 U.S.C.§ § 551(13), 704.

language of the PSLF Statute that defines a "public service job" to include "a full-time job in . . . government." 20 U.S.C. § 1087e(m)(3)(B)(i). Further, the Rule is unlawful because it purports to give ED the authority to exclude an otherwise eligible employer from the program if ED designates that employer as having a "substantial illegal purpose," but nothing in the PSLF Statute or any other source of authority suggests that Congress empowered ED to alter the eligibility criteria set by statute. Where, as here, "an agency acts in a manner not authorized by statute, its action is ultra vires and a violation of the APA." *Ryan*, 974 F.3d at 19 (citing 5 U.S.C. § 706(2)(C)).

### 1.   The Rule Contradicts the Plain Language of the PSLF Statute.

The Court's inquiry "must start with the text of the statute itself." *Ryan*, 974 F.3d at 19 (cleaned up). The Rule violates the plain language of the PSLF Statute. That statute imposes a mandatory duty: ED "*shall* cancel the balance of interest and principal due" on "*any*" applicable loan for borrowers who meet the statutory requirements, which include ten years of employment in a "public service job." 20 U.S.C. § 1087e(m) (emphases added). *SAS Inst., v. Iancu*, 584 U.S. 357, 362 (2018) ("The word 'shall' generally imposes a nondiscretionary duty," while the word 'any' in this context in this context implies every member of a class or group.) (cleaned up). Congress defined "public service job" to include "a full-time job in . . . government (excluding time served as a member of Congress)." 20 U.S.C. § 1087e(m)(3)(B)(i). The indefinite article "a" denotes that Congress meant to encompass "*any*, unspecified" job in government. *U.S. v. Raymond*, No. CR 21-380 (CKK), 2023 WL 7005345, at *2 (D.D.C. Oct. 24, 2023) (citing *McFadden v. U.S.*, 576 U.S. 186, 191 (2015)); *see also Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 971 F.3d 340, 354 (D.C. Cir. 2020). So, when Congress defined "public service job" in the PSLF Statute, it "supplie[d] an unequivocal answer" to the question of eligible PSLF employment: any full-time job in government, except as a member of Congress, is a public service job eligible for PSLF. *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018). The Rule

contravenes the PSLF Statute by authorizing the exclusion of entities that otherwise meet the statutory definition of a "public service job."[6]

Congress's unambiguous definition of the term "public service job" leaves "no room for agency interpretation." *Duffus v. MaineHealth*, 791 F. Supp. 3d 61, 81 (D. Me. 2025). "Statutory definitions control the meaning of statutory words," *Burgess v. United States*, 553 U.S. 124, 129 (2008) (cleaned up), so "[w]hen a statute includes an explicit definition," the Court—and the agency—"must follow that definition." *Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020) (cleaned up). Indeed, the PSLF Statute provides one government job that is *not* eligible for PSLF, serving as a member of Congress, confirming that Congress did not intend to exclude any others. *See Santana v. Holder*, 731 F.3d 50, 56 (1st Cir. 2013). Where "a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer." *SAS Inst.*, 584 U.S. at 363.

Confronting similar situations, courts "consistently str[ike] down administrative narrowing of clear statutory mandates." *Sierra Club v. EPA*, 129 F.3d 137, 140 (D.C. Cir. 1997).[7] The First Circuit in *Santana*, 731 F.3d at 56, considered the legality of the "post-departure bar": that is, the government's asserted bar on an alien filing a motion to re-open after departing the United States. The court held that a statute stating that "[a]n alien may file one motion to reopen proceedings," 8 U.S.C. § 1229a(c)(7)(A), "unambiguously confers upon 'an alien' the authority and the right to

---

[6] As the Department has recognized, the regulatory definition of "qualifying employer" tracks the statutory definition of "public service job." *See, e.g.*, Final Rule, 90 Fed. Reg. 48967.

[7] *See, e.g., Waterkeeper All. v. Env't Prot. Agency*, 853 F.3d 527, 534 (D.C. Cir. 2017); *W. Minnesota Mun. Power Agency v. FERC*, 806 F.3d 588, 592 (D.C. Cir. 2015); *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 115 (D.C. Cir. 2005); *New York v. EPA*, 413 F.3d 3, 40 (2005); *Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002); *Public Citizen v. FTC*, 869 F.2d 1541, 1556 (D.C. Cir. 1989); *Public Citizen v. Young*, 831 F.2d 1108, 1122 (D.C. Cir. 1987); *Sierra Club v. EPA*, 719 F.2d 436, 462 (D.C. Cir. 1983); *Alabama Power Co. v. Costle*, 636 F.2d 323, 356 (D.C. Cir. 1979); *Public Citizen v. Shalala*, 932 F. Supp. 13, 17 (D.D.C. 1996).

file a motion to reopen, in language that admits of no exceptions." *Id.* The court rejected the government's contrary argument:

> The government's arguments amount to nothing less than a request to write words into the statute that are not there. Essentially, the contention is that we should revise the text of 8 U.S.C. § 1229a(c)(7)(A) to say that '[a]n alien may file one motion to reopen proceedings under this section, *excepting other limitations that the Attorney General may prescribe*.' . . . . Under its theory, the government possesses the discretion to impose other substantive limitations on a noncitizen's right to file a motion to reopen that lack any foundation in the statutory language. We decline to adopt such a construction.

*Id*.

In *Lopez-Soto v. Hawayek*, the First Circuit rejected an atextual limitation on the statutory phrase "any individual . . . [who] comes to a hospital" to mean only individuals who come to the hospital's emergency department, finding that the statute "unambiguously" covers "*any* victim of a detected medical emergency, regardless of how that person enters the institution or where within the walls he may be when the hospital identifies the problem." 175 F.3d 170, 173–76 (1st Cir. 1999) (quoting 42 U.S.C. § 1395dd(b)); *see also Asociacion Hosp. Del Maestro, Inc. v. Becerra*, 10 F.4th 11, 16 (1st Cir. 2021). The Rule likewise imposes a limitation not found in the statute's text.

## 2. Congress Did Not Delegate to ED the Authority to Promulgate the Final Rule.

The Rule is unlawful because Congress did not delegate, expressly or impliedly, the authority ED now claims. Congress did not leave "any leeway" for ED to "tack on additional criteria" to its statutory definition of "public service job." *See Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. *Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016). The scope of authority delegated to an agency by Congress, too, "reduces to a question of statutory construction." *Ryan*, 974 F.3d at 19.

First, Congress may expressly delegate authority to a federal agency by directing the agency to issue regulations on a particular issue. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 & n.5 (2024); *Sutherland v. Peterson's Oil Serv., Inc.*, 126 F.4th 728, 738-39 n.5 (1st Cir. 2025). The PSLF Statute, however, contains no language empowering ED to create any exclusions to PSLF eligibility, let alone the power to exclude entities with a "substantial illegal purpose"—a concept nowhere mentioned in the statute. *Cf. Am. Bar Ass'n v. FTC*, 430 F.3d 457, 467 (D.C. Cir. 2005). As in *Santana*, finding ED has the authority to exclude otherwise eligible employers would require a wholesale rewriting of the PSLF Statute to define public service job as including "a full-time job in . . . government (excluding time served as a member of Congress) . . . *excepting other limitations that the Secretary may prescribe.*" But ED cannot "write words into the statute that are not there." *Santana*, 731 F.3d at 56.

Second, Congress may "empower an agency to prescribe rules to fill up the details of a statutory scheme" by implicitly delegating authority to a federal agency, using language like "'appropriate' or 'reasonable.'" *Loper Bright*, 603 U.S. at 395 & n.6 (cleaned up). But the PSLF Statute contains no such language empowering ED to restrict the term "public service job." "Conspicuously missing" from the statutory text "is any language of delegation" at all. *Waterkeeper Alliance v. EPA*, 853 F.3d 527, 535535 (D.C. Cir. 2017). And contrary to ED's claims, Final Rule, 90 Fed. Reg. at 48972, there are no "details" regarding PSLF employer eligibility that ED needs to "fill up" because the PSLF Statute itself provides the requisite detail in its statutory definition. *See Loper Bright*, 603 U.S. at 395.

ED's arguments for implied delegation strain credulity. ED cannot "expound upon what constitutes *public service*," NPRM, 90 Fed. Reg. at 40156, in a way that contradicts the defined term "public service job." Congress does not authorize agencies to re-define terms that are already

defined by statute; "otherwise, statutes that expressly provide for agency definition would be superfluous." *Duffus*, 791 F. Supp. 3d at 80; *see also Jordan v. Sec'y of Educ.*, 194 F.3d 169, 171 (D.C. Cir. 1999); *Brown v. Gardner*, 513 U.S. 115, 118 (1994). Likewise, ED cannot rewrite a specific statutory term in the name of effectuating what it perceives as Congress's "broad[ ]," "general[ ]" intent." Final Rule, 90 Fed. Reg. at 48972; *see In re Lazarus*, 478 F.3d 12, 18. As courts have repeatedly recognized in comparable situations, there is no express or implied delegation from Congress for the authority that ED claims.[8]

Even in the face of explicit statutory language conferring some authority on federal agencies to condition eligibility—language that is absent here—the First Circuit has rejected a federal agency's attempt to seize for itself the authority to alter a program's statutory eligibility requirements beyond what Congress directed. In *City of Providence*, Congress had explicitly authorized DOJ to condition states' and local governments' participation in a federal program on agreement that the recipient "will comply with . . . all other applicable Federal laws," 954 F.3d at 36 (quoting 34 U.S.C. § 10153(a)(5)(D)), but the First Circuit found that DOJ's immigration-law condition exceeded the agency's authority—even in the face of that specific statutory language. *Id.* at 39. In reaching this conclusion, the court noted that it would "strain[] credulity to think that Congress would bury" the sweeping authority claimed by DOJ in that text. *Id.* at 37. In sum, the First Circuit found that "nothing in the [governing] statute indicate[d] that Congress intended to permit the DOJ to create qualification requirements unrelated to the grant program simply to advance its own policy priorities." *Id.* at 39.*Id.* at 39. ED's claim to the same sweeping authority here, without any statutory language at all, must be rejected.

---

[8] *See, e.g.*, *SAS Inst.*, 584 U.S. at 368-69368-69; *Brown*, 513 U.S. at 117; *Cent. United Life Ins*, 827 F.3d at 75; *Am. Bar Ass'n*, 430 F.3d at 467; *Jordan*, 194 F.3d at 171; *Ethyl Corp. v. E.P.A.*, 51 F.3d 1053, 1058 (D.C. Cir. 1995); *Duffus*, 791 F. Supp. 3d at 81–82.

### 3.   Other Interpretive Tools Confirm ED Lacks Authority to Promulgate the Rule.

"Where the text is as clear as it is here, that is the end of the matter." *Cent. United Life Ins.*, 827 F.3d at 74 (cleaned up). But applying other interpretive tools "underscores the implausibility of the Government's interpretation." *Van Buren v. United States*, 593 U.S. 374, 394 (2021). First, "Congress has acted intentionally and purposely" by including program participation limitations based on prior criminal convictions "in one section of a statute but omit[ting them] in another." *Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81, 87 (1st Cir. 2021) (cleaned up); *see* 20 U.S.C. §§ 1091(a)(6) (students with financial aid fraud convictions banned from new aid), 1078-2(a)(1)(B) (similar), 1094(a)(16) (similar for schools). If Congress wanted to impose a similar limit for PSLF employers, "it knew exactly how to do so." *SAS Inst.*, 584 U.S. at 365. Second, "[t]he novelty of" ED's interpretation of the PSLF Statute "supplies another strike against it," as for two decades no presidential administration has read the PSLF Statute to provide the authority ED now claims. *Bondi v. VanDerStok*, 604 U.S. 458, 480 (2025). Third, all legislative history includes all government jobs as eligible for PSLF, including the very first version, which would have limited PSLF forgiveness to *only* public employees. 153 Cong. Rec. S9448, S9461; H.R. 2669 § 142. Fourth, the Rule departs significantly "from the agency's ordinary statutory duties," for the first time claiming ED's authority to enforce criminal laws. *Merck & Co. v. U.S. Dep't of Health & Hum. Servs.*, 385 F. Supp. 3d 81, 97 (D.D.C. 2019) (cleaned up), *aff'd*, 962 F.3d 531 (D.C. Cir. 2020); *see* NPRM, 90 Fed. Reg. 40155 (admitting "new administrative responsibilities").

Finally, constitutional principles provide "extra icing on a cake already frosted," *Van Buren*, 593 U.S. at 394 (cleaned up), since ED has pointed to no "clear congressional authorization" for the tremendous "power it claims." *W. Virginia v. EPA*, 597 U.S. 697, 723 (2022) (cleaned up). The power claimed by ED is extraordinary in three respects: first, ED seeks to regulate virtually every non-profit organization and state and local government in the United States, "a significant portion

17

of the American economy," *id.* at 722 (cleaned up); second, ED seeks to do so without any "intelligible principle" from Congress, instead admitting the President set the priorities, *FCC v. Consumers' Rsch.*, 606 U.S. 656, 683 (2025); Final Rule, 90 Fed. Reg. at 48975; and third, ED raises serious federalism concerns by purporting to allow the agency to designate entire state agencies as having a "substantial illegal purpose." *See Ryan*, 974 F.3d at 29.

### 4. ED Has No Valid Authority for Promulgating the Rule.

#### i. ED Cannot Rely on General Rulemaking Authority or Congressional Purpose.

The general rulemaking statutes invoked by ED in the NPRM do not give ED the authority to promulgate the Rule. *See* NPRM, 90 Fed. Reg. at 40156 & n.4 (citing 20 U.S.C. §§ 1082, 1221e-3, 3441, 3474, 3471). "[A]n agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority." *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006); *Merck & Co.*, 385 F. Supp. 3d at 92. Indeed, the primary statute invoked by ED is clear: ED may promulgate regulations only "to carry out functions *otherwise* vested in the Secretary by law." 20 U.S.C. § 1221e-3 (emphasis added). The PSLF Statute gives no authority to limit participation in PSLF beyond what Congress directed, so neither do the general rulemaking statutes. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general," especially where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.") (cleaned up).

ED likewise cannot rely on its vague invocation of Congressional intent. Final Rule, 90 Fed. Reg. at 48976 ("Congress would not have wanted public funds to support employment that harms the public because it advances illegal activity."); *id.* at 48972 ("[T]his rule fulfills the Department's obligation to enforce PSLF consistent with its statutory purpose."). An agency cannot substitute its own judgment for the judgment of Congress, even when it claims to be

furthering Congressional purpose. *Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002); *Colo. River*, 466 F.3d at 139–40 (agencies are "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes"); *Jordan*, 194 F.3d at 172. And, of course, ED cannot base the Rule on its preferred approach to policymaking, because "[d]isagreeing with Congress's expressly codified policy choices isn't a luxury administrative agencies enjoy." *Cent. United Life Ins. Co.*, 827 F.3d at 73; *Sierra Club*, 294 F.3d at 161.

  **ii. ED Cannot Rely On the "Illegality Doctrine" as a Source of Authority.**

  ED asserts that "the illegality doctrine utilized by the Internal Revenue Service (IRS) serves as a basis for ED to promulgate" the Rule. Final Rule, 90 Fed. Reg. at 48967. ED claims "the illegality doctrine can clearly be applied in scenarios outside of just those where the IRS has utilized it in the past" and "provides a clear basis for" ED to "deny[] certain statutory benefits to organizations whose aims and activities are harmful to the public interest." *Id.* at 48975. But ED cites no instance where the illegality doctrine has been applied "outside of" the IRS. ED's invocation of the illegality doctrine, wholly untethered from the PSLF Statute, cannot support the Rule.

  As to the IRS, the "illegality doctrine" arises directly from the Supreme Court's reading of the tax code using traditional interpretive principles. In *Bob Jones University v. United States*, the seminal illegality doctrine case, the Supreme Court reviewed the plain language of the tax code, 26 U.S.C. §§ 170, 501(c)(3), and concluded from the statute's use of "charitable" that "Congress' intention was to provide tax benefits to organizations serving charitable purpose." 461 U.S. 574, 587 (1983). The Court then found "unmistakable evidence" that Congress adopted "common law standards of charity" that "are deeply rooted in our history, as in that of England," as "the special privileges that have long been extended to charitable trusts." *Id.* 586–88. The Supreme Court

interpreted the tax code using the "nonderogation canon," which "instructs that statutes which invade the common law are to be read with a presumption favoring the retention of long-established and familiar principles." *See Ryan*, 974 F.3d at 20.

None of this applies to PSLF. On the text, the PSLF Statute uses the term "public service job"—*not* the term "charitable," the statutory term of art to which the Supreme Court tethers the illegality doctrine. And of course there is no common law of student loans, let alone centuries of law, meaning that the nonderogation canon cannot apply. ED's claimed authority to apply the "illegality doctrine" to governments goes even further afield, as governments are not constituted via the common law of trusts, nor subject to the IRS's own illegality doctrine—and doing so raises serious federalism concerns.

ED's invocation of the illegality doctrine is further flawed because the text of the PSLF Statute is clear that Congress chose the IRS's determination of an organization's charitable purpose—*not* ED's—to control PSLF eligibility. The PSLF Statute specifically designates within its definition of "public service job" a full-time job at "an organization that is described in [26 U.S.C. § 501(c)(3)] and exempt from taxation under [26 U.S.C. § 501(a)]." 20 U.S.C. § 1087e(m)(3)(B)(i). Congress used this "archetypal language" "linking the definitional term" of "public service job" "directly to the organization's federal tax-exempt status." *Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473, 476 (1st Cir. 2005) (collecting similar statutes); *see id.* at 477 (this determination is "committed . . . to the IRS"). Congress's decision to incorporate the IRS's designation of non-profit charitable status into the PSLF Statute forecloses any argument that it delegated to ED the authority to set up a separate, parallel regime.

### iii.    ED Cannot Rely on Any Inherent Authority to Promulgate the Rule.

To the extent ED invokes any inherent authority to promulgate the Rule, that would violate the core principles of administrative law. Final Rule, 90 Fed. Reg. at 48971 (ED asserting as a

general principle that "revocation of statutory benefits to organizations engaged in illegal activities is proper if its purposes and activities are illegal or otherwise contrary to public policy."); *id.* at 48975 (similar). ED "has only those powers conferred upon it by Congress," and "it is wrong to speak of agencies as having *any* inherent authority." *HTH Corp. v. NLRB*, 823 F.3d 668, 679 (D.C. Cir. 2016); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). A federal agency may not act as a roving enforcer of criminal law without congressional authorization. Congress designates specified criminal enforcement power to some agencies, and not others. *See, e.g.*, 26 U.S.C. § 7608 (IRS for criminal tax laws); 18 U.S.C. § 3063 (EPA for criminal environmental laws). Congress creates eligibility requirements tied to certain criminal convictions for some federal programs, and not others. *See, e.g.*, 20 U.S.C. §§§ 1091(a)(6), 1078-2(a)(1)(B), 10941094(a)(16) (barring students and schools with student loan fraud-related convictions); 42 U.S.C. § 1320a-7(a) (Medicare and Medicaid-related convictions). Recognizing the inherent authority ED claims would undo all of these careful Congressional choices in one fell swoop. Because ED has gone far beyond what the PSLF Statute allows, the Court should "police the outer statutory boundaries of [Congress's] delegations," *Loper Bright*, 603 U.S. at 404, and find the Rule contrary to law and in excess of ED's statutory authority.

### B. The Rule is Arbitrary and Capricious.

Under the APA, an agency action is arbitrary and capricious if it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). Agencies must provide "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). The Rule is unreasoned and pretextual and should be vacated.

**1.  No Rational Connection Exists Between the Rule and ED's Justification.**

To survive APA review, a federal agency must explain the reasons underlying its rulemaking. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 50 (1983). That explanation must be sufficient to justify the rule and must include "a rational connection between the facts found and the choice made." *Ohio*, 603 U.S. at 292. By the same token, courts "cannot ignore [a] disconnect between the decision made and the explanation given." *Dep't of Com.*, 588 U.S. at 785. Here, there are three ways in which the Rule is disconnected from the rationale ED provided for it.

First, in promulgating the Final Rule, ED had an obligation to review the "relevant data and articulate a satisfactory explanation for its actions including a rational connection between the facts found and the choice made." *Motor Vehicle Manufacturers Ass'n of the United States*, 463 U.S. at 43. Here, the administrative record is devoid of any facts related to the existence, let alone the pervasiveness, of PSLF employers that have a "substantial illegal purpose." ED itself provided no facts in support of the Rule, instead citing only vague notions of "protect[ing] hardworking taxpayers", Final Rule, 90 Fed. Reg. 48966, preventing "harm to […] communities and the public good", *id.* at 48968, and the unsupported "presump[tion] that Congress would not want PSLF benefits to be received by employees of organizations that the Department knows are not serving the public interest", *id.* at 48972. But Congress did not ask ED to presume anything. *See supra* Section II.A.2. And ED provides no other facts to demonstrate why *this* Rule and why *now*. Put simply, ED has promulgated a Rule to address a nonexistent problem. In addition, ED's reliance on vague notions that "Congress has not intended it to consider" makes the Final Rule arbitrary and capricious. *Motor Vehicle Manufacturers Ass'n of the United States*, 463 U.S. at 43.

Second, even if ED had not manufactured the problem it was purporting to address, there is no logical connection between the rationale offered by the Rule (to protect taxpayer dollars by

limiting PSLF eligibility only to employers engaged in "lawful conduct") and the Rule itself (which renders employers ineligible based on only a few select categories of assertedly unlawful activity). ED repeatedly claims that it promulgated the Rule to "ensure that taxpayer dollars are not misused," by "limiting PSLF eligibility to borrowers employed by organizations that do not engage in unlawful conduct." Final Rule, 90 Fed. Reg. 48966–68; *e.g.*, *id.* at 48985; *id.* at 48968. ED's decision to include only six narrow categories of supposedly illegal conduct, however, does not follow this stated rationale. The administrative record is silent as to why ED excluded innumerate other possible forms of actual unlawful conduct, such as financial fraud and tax evasion, to accomplish its purported goal of restricting PSLF eligibility to support only "lawful conduct." *Littlefield v. U.S. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023) (stating that the court "must conduct a searching examination to ensure that the agency's decision is reasonably supported by the administrative record").

Third, much of the conduct the Rule targets, including Diversity, Equity, and Inclusion (DEI) programs and transgender healthcare for youth, is *not actually illegal* in many States. The pretextual nature of the Rule is self-evident and renders it unlawful. *See Saget v. Trump*, 375 F. Supp. 3d 280, 361 (E.D.N.Y. 2019) ("An agency's actions are arbitrary and capricious under the APA if they are pretextual."). "[A] court cannot sustain agency action founded on a pretextual or sham justification that conceals the true 'basis' for the decision." *Id.* at 361.

ED's actions are not (as it claims) intended to stop taxpayer dollars from supporting unlawful conduct; the true purpose of the Rule is to root out lawful conduct and to target causes that this Administration disfavors. Indeed, each of the prongs of the "substantial illegal purpose" definition aligns with efforts by this Administration to target four specific areas: immigrants' rights, transgender healthcare, DEI initiatives, and political protest. As to immigration, beginning

23

on the first day of the Administration, the President issued five executive orders and two proclamations signaling its intent to crack down on immigrants, characterizing immigration as a categorical public safety threat and an "invasion."[9] The Administration has also attempted to stomp out any opposition to these harsh policies and silence protesters, as evinced by its targeting of immigrants who lawfully speak out against the Administration's actions. *See, e.g.*, *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 175 (D. Mass. 2025). As to political protest, the Administration's intent to crack down on opposition protesters was also displayed in two Executive Orders that signal an intent to punish speech and protest activities under the guise of quelling political violence.[10] Further, the Administration has weaponized Federal anti-discrimination law to engage in widespread attacks on DEI initiatives, including by issuing several Executive Orders that seek to target DEI and gender identity.[11] And this Administration has sought to restrict and

---

[9] *See* Executive Order 14160, 90 Fed. Reg. 8449, "Protecting the Meaning and Value of American Citizenship", January 20, 2025; Executive Order 14159, 90 Fed. Reg. 8443, "8443, "Protecting the American People Against Invasion", January 20, 2025; Executive Order 14165, 90 Fed. Reg. 8467, "8467, "Securing Our Borders", January 20, 2025; Executive Order 14161, 90 Fed. Reg. 8451, "Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats", January 20, 2025; Executive Order 14163, 90 Fed. Reg. 8459, "Realigning the United States Refugee Admissions Program", January 20, 2025; Proclamation 10886, 90 Fed. Reg. 8327, "8327, "Declaring a National Emergency at the Southern Border of the United States", January 20, 2025; and Proclamation 10888, 90 Fed. Reg. 8333, "8333, "Guaranteeing the States Protection Against Invasion", January 20, 2025.

[10] *See* Order entitled "Designating Antifa as a Domestic Terrorist Organization," 90 Fed. Reg. 46317, September 22, 2025; National Security Presidential Memorandum 7, 90 Fed. Reg. 47225, "Countering Domestic Terrorism and Organized Political Violence."

[11] *See* Executive Order 14168, 90 Fed. Reg. 8615, "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," January 20, 2025; Executive Order 14151, 90 Fed. Reg. 8339, "Ending Radical and Wasteful Government DEI Programs and Preferencing," January 20, 2025; Executive Order 14173, 90 Fed. Reg. 8633, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," January 21, 2025; *See also* "Dear Colleague" Letter, Feb. 14, 2025, Office of Civil Rights, Department of Education: https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf    (warning

stigmatize transgender healthcare by threatening providers, including with criminal prosecution.[12] The Rule is simply another piece of this broad strategy. Indeed, ED *admits* there was no reasoning behind these categories other than they were included in the PSLF Executive Order and thus "identified" by the President "as being of greatest concern." Final Rule, 90 Fed. Reg. at 48975.

To be sure, a court may not "set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities," *Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, 791 F. Supp. 3d 119, 178–79 (D. Mass. 2025), but "furthering the President's wishes cannot be a blank check for [agencies] to do as they please." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 55 (D.D.C. 2025) (cleaned up). Rather, the APA requires that ED independently justify the singling out of these categories by demonstrating "a rational connection between the facts, the agency's rationale, and the ultimate decision." *Id.* at 55. For the reasons explained above, ED has failed to do so. ED fails to explain how including these narrow categories of proscribed conduct in the definition of "substantial illegal purpose"—to the exclusion of all others—will address the rationale of ensuring that taxpayer dollars are not misused. Instead of rooting out illegal activity, the Rule threatens to chill lawful conduct and exhibits unmistakable animus towards groups and initiatives that the Administration disfavors and seeks to punish.

---

education agencies and institutions against Diversity, Equity, and Inclusion initiatives, citing Federal antidiscrimination law).

[12] *See, e.g.*, Executive Order 14187, 90 Fed. Reg. 8771, "Protecting Children From Chemical and Surgical Mutilation", January 28, 2025 (threatening meritless criminal prosecutions against providers of transgender healthcare, citing a statute prohibiting female genital mutilation of minors, 18 U.S.C. § 116, despite the statute's exclusive application to "non-medical" procedures and express exceptions for medical care provided by a licensed practitioner); Declaration of the Secretary of Health and Human Services, RE: Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents (Dec. 18, 2025) (threatening providers with lifetime bans from Medicaid and Medicare if they provide transgender healthcare for young people).

**2. The Rule Inexplicably Targets State Employers While Ignoring Federal Employers.**

The Rule is arbitrary and capricious for another independent reason: it excludes Federal employers from scrutiny without any discernable justification. In articulating the "service areas that could be most affected by the regulation," ED lists, among other things, "governance, . . . K-12 education, and higher education," demonstrating that it expects to exclude various governments and their instrumentalities from PSLF eligibility. Final Rule, 90 Fed. Reg. at 48995. But ED highlights one notable exception: the entirety of the Federal government. *Id.* at 48994 ("We assume that Federal agencies will comply with the law and do not expect a reduction in forgiveness for Federal employees."). This astonishing disparity is not backed by any reasoned explanation. *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1122 (N.D. Cal. 2006) (agency rule was arbitrary and capricious where it "relied on assumptions that had no factual support in the record").

Further, ED acknowledges that it will use an employer's tax employment identification number (E.I.N.) to determine PSLF eligibility, and that "employees in one . . . agency may be affected by the activities of employees in other organizations under the same E.I.N." Final Rule, 90 Fed. Reg. at 48994. Because "[g]overnment agencies may have many service areas under a single E.I.N.," *id.*, the Rule leaves open the possibility that an entire government body could lose PSLF eligibility because of the actions of a few employees. NPRM, 90 Fed. Reg. at 40169 ("the County of Los Angeles has a single EIN covering various departments including the Los Angeles County Public Defender, Los Angeles County Department of Children and Family Services, Harbor-UCLA Medical Center, and the County of Los Angeles Fire Department."). There is not, and cannot be, a reasoned explanation as to why the Rule operates with such punishing effect

toward State and local government employers, while excluding Federal employers from similar treatment.

### 3. The Rule's Terms Are Vague and Unsupported.

It is arbitrary and capricious "to issue terms and conditions so vague as to preclude compliance therewith." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, *Bureau of Land Mgmt.*, 273 F.3d 1229, 1233 (9th Cir. 2001). Each "substantial illegal purpose" identified in the Rule is defined in a manner that is impermissibly vague and overbroad.

First, the Rule defines "substantial illegal purpose" to include "aiding or abetting violations of 8 U.S.C. [§] 1325 or other Federal immigration laws." 34 C.F.R. § 685.219(b)(30)(i). ED does nothing to clarify what it means to "aid[ ] or abet[ ] violations of . . . other Federal immigration laws," other than offering the paltry explanation that "[t]he phrase 'Federal immigration law' is broad, but it is easily understood and only applies to Federal law that regulates immigration." Final Rule, 90 Fed. Reg. at 48982. In addition, Federal immigration law includes both criminal and civil violations, yet the Rule applies the criminal aiding and abetting definition in 18 U.S.C. § 2. Indeed, there is no general civil aiding and abetting statute. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994). There is therefore no such offense as aiding and abetting a violation of civil immigration law. By applying the criminal aiding and abetting definition in 18 U.S.C. § 2 to both civil and Federal immigration laws, however, this provision sweeps in a breathtaking scope of lawful conduct, potentially including the lawful furnishing of assistance to noncitizens.[13] Such a contradiction renders the Rule hopelessly vague.

---

[13] ED was on notice of this vagueness. For example, the American College of Emergency Physicians commented that the Rule's prohibition on "aiding and abetting" violations of Federal immigration laws could be construed to cover the provision of legally-mandated emergency medical care, such that "nearly every hospital with an [emergency department] would be disqualified as PSLF employers. This would undermine the very purpose of PSLF by stripping

No reasonable employer (or employee) could understand where that line is drawn, given the vague reference to "Federal law that regulates immigration." *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1251 (failure to "provide a clear standard for determining when" regulation is violated was arbitrary and capricious). As this Court recently held, "reliance on an undefined term . . . is arbitrary and capricious because it allows the [agency] to arrive at whatever conclusion it wishes without adequately explaining the standard on which its decision is based." *Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, 791 F. Supp. 3d at 180 (cleaned up).

Second, the Rule defines "substantial illegal purpose" to include "supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy." 34 C.F.R. § 685.219(30)(ii). The Rule adopts the definition of "terrorism" in 18 U.S.C. § 2331. But it fails to offer any definition of what constitutes "supporting" terrorism. Final Rule, 90 Fed. Reg. at 48983. Federal law already criminalizes the provision of material support to terrorists and designated foreign terrorist organizations, 18 U.S.C. § 2339A–B, but the Rule does not incorporate these existing statutes into its definition of "supporting." The Administration's open hostility toward political protest appears to be the animating motivation behind the inclusion of this prong, which may penalize organizations who "support" protesters the Administration believes to be "violen[tly] . . .

---

eligibility from the clinicians most committed to caring for underserved populations." L. Anthony Cirillo, Comment Letter (Sept. 17, 2025) Doc No. 88-1 at 398–401; *see also, e.g.*, Robin Jenkins, Comment Letter (Sept. 17, 2025) Doc No. 88-1 at 343 (commenting that the Rule's introduction of "vague and politically malleable categories such as 'substantial illegal purpose' and explicitly referencing 'aiding and abetting violations of . . . Federal immigration laws,'" threatens to punish public service immigration attorneys "not because of misconduct, but because of the clients they legally represent.").

obstructing or influencing Federal Government policy." 34 C.F.R. § 685.219(30)(ii). The ambiguity is arbitrary and capricious.

Third, the Rule defines "substantial illegal purpose" to include "[e]ngaging in the trafficking of children[.]" 34 C.F.R. § 685.219(b)(30)(iv). It defines "trafficking" as "transporting a child or children from their State of legal residence to another State without permission or legal consent from the parent or legal guardian for purposes of emancipation from their lawful parents or legal guardian, in violation of applicable law." 34 C.F.R. § 685.219(b)(33). Despite repeatedly elsewhere relying on federal criminal law, ED ignores the definitions of "sex trafficking" and "human trafficking" in federal laws, which differ vastly from the Rule. *See* 18 U.S.C. § 1591 *et seq.* Instead, ED makes up a definition out of whole cloth but provides no explanation for why it fails to follow existing definitions, instead relying on the tautological statement that ED will be "unable to find that an organization is engaged in trafficking if the organization's conduct does not meet the elements necessary to show that they have engaged in such unlawful conduct." Final Rule, 90 Fed. Reg. at 48983. ED says nothing about what "elements" are "necessary" to prove unlawful trafficking under its definition. Rather, it is clear, as the President indicated in the PSLF EO, 90 Fed. Reg. 11885, that this prong was included to target youth who travel "to so-called transgender sanctuary States," and that this provision is mere pretext for chilling lawful activities of employers who may provide support services to these youth.

Fourth, the Rule's definition of "substantial illegal purpose" includes "[e]ngaging in a pattern of aiding and abetting illegal discrimination." 34 C.F.R. § 685.219(b)(30)(v). In turn, it defines "illegal discrimination" as "a violation of any Federal discrimination law including, but not limited to, the Civil Rights Act of 1964 (42 U.S.C. § 1981 *et seq.*), the Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), and the Age Discrimination in Employment Act of 1967

(29 U.S.C. 621 *et seq.*).” 34 C.F.R. § 685.219(b)(12). ED imports the criminal aiding and abetting standard in its definition of illegal discrimination. This criminal standard, which relies on an underlying criminal violation, is inapplicable to federal anti-discrimination laws, as all of the listed laws in the definition are civil in nature. *See* 34 C.F.R. § 685.219(b)(12). Further, the Rule fails to clarify what constitutes a “pattern” of aiding and abetting illegal discrimination. *See* 34 C.F.R. § 685.219(b)(30)(v). The Administration has shown that it believes DEI initiatives to violate these laws, which appears to be the goal of this definition, but no reasonable employer could understand what conduct ED deems as unlawful “aiding and abetting” by its explanation. *See* Executive Order 14173, 90 Fed. Reg. 8633, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Jan. 21, 2025 (“dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called . . . DEI . . . can violate the civil-rights laws of this Nation.”).

Fifth, the Rule provides that it is a “substantial illegal purpose” to “engag[e] in a pattern of violating” State laws of “(i) Trespassing; (ii) Disorderly conduct; (iii) Public nuisance; (iv) Vandalism; or (v) Obstruction of highways.” 34 C.F.R. § 685.219(b)(30)(vi), (b)(34). ED makes no effort to explain how or why it selected this very narrow list of five offenses—all of which appear related to political protest—and offers no reasoning as to why only these particular State-level offenses warrant revoking qualified employer status. These State law violations are often misdemeanors or punishable by small fines. Yet ED seeks to impose the disproportionate penalty of total loss of PSLF eligibility on employers when it finds such a violation. Its justification borders on the nonsensical. According to ED, this provision “is intentionally broad and encompasses a wide array of conduct, but it is also sufficiently clear and puts employers on notice.” Final Rule, 90 Fed. Reg. at 48980. Also, the Rule fails to clarify what constitutes a “pattern” of violating these limited State laws, leaving employers in the dark as to whether, for example, two employees being

separately cited for disorderly conduct would mean the organization "engag[es] in a pattern of violating State laws" under the Rule.

Sixth, the Rule defines as a "substantial illegal purpose" "engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law." 34 C.F.R. § 685.219(b)(30)(iii). The Rule incorporates the definitions of "castration or mutilation" from Executive Order 14187, which is titled "Protecting Children from Chemical and Surgical Mutilation," and defines "Chemical castration or mutilation" to include the use of puberty blockers and sex hormones. 34 C.F.R. § 685.219(b)(3). By invoking the Executive Order, the Rule attempts to associate non-surgical transgender healthcare for youth with illegal female genital "mutilation." Lawful, state-regulated, medically appropriate and necessary transgender healthcare is not genital mutilation under Federal law. 18 U.S.C. § 116 (defining female genital mutilation). The Rule will cause confusion about what is actually permissible and have a chilling effect on lawful conduct, which is exactly what it aims to achieve. Additionally, the Rule adopts Executive Order 14187's definition of "child" or "children" as "an individual or individuals under 19 years of age," 34 C.F.R. § 685.219(b)(4), which inexplicably includes legal adults. ED's only explanation for why a definition pertaining to children encompasses legal adults is a rote statement that Executive Order 14187 "provides the basis for the proposed definition" and an assertion that the definition will promote "uniformity" and "avoid confusion." Final Rule, 90 Fed. Reg. at 48981. This is insufficient and does not redeem ED's vague and unsupported Rule.

### 4. The Rule is Ambiguous So Employers Will Not Know Their Legal Obligations.

The Rule is further arbitrary and capricious because it contains ambiguous and contradictory evidentiary and notice requirements, which combined with the Rule's vague definitions, prevent employers from knowing their obligations under the Rule.

First, the Rule creates ambiguous evidentiary standards that provide employers with virtually no guidance and the Secretary with essentially unchecked discretion to brand employers as having a "substantially illegal purpose." Though the Rule provides for three categories of "conclusive evidence" that establish a "substantially illegal purpose," the Rule also states that the Secretary may determine an employer has a "substantial illegal purpose" "by a preponderance of the evidence." 34 C.F.R. § 685.219(h)(1). The Rule provides no guidance about what kinds of evidence will be considered beyond the three types of enumerated conclusive evidence, whether that evidence will be subject to any rules of admissibility designed to ensure its reliability, or how ED will gather and review such evidence.

Second, the Rule provides for no defined procedures or notice requirements other than a single reference to an employer's right to "notice and opportunity to respond." 34 C.F.R. § 685.219(h)(1). There are no requirements regarding the issuance of notice to employers, either in terms of timeframe or substance, no requirements regarding the timeframe or form of an employer's response, and no procedures ED must follow in conducting its review, issuing its decision, or reviewing an employer's response. In practice, the Rule is so loose as to empower ED to provide as much or as little process as it wants in any given circumstance.

Third, the Rule fails to clearly state what is a "substantially illegal purpose." The Rule does not make clear *whose* activities are relevant for determining an employer's illegality, *how much* illegal activity can disqualify an employer, and *how material* such activities must be to the employer's purpose. After commenters raised these concerns,[14] ED stated that the Rule "make[s]

---

[14] *See, e.g.*, 33 Cities and Counties, Comment Letter (Sept. 17, 2025) Doc No. 88-1 at 658 (33 cities and counties commented that the proposed Rule ties PSLF eligibility to "ambiguous and politically contested definitions of illegal conduct," creating uncertainty and local governments will not be able to "provide accurate guidance to [their] employees or may face legal claims if staff unexpectedly lose eligibility"); Gerald Hartman & George Mykulak, Comment Letter (Sept. 16,

clear that the Secretary weighs evidence of illegal activity to determine whether that illegal activity is so substantial that the organization has a substantial illegal purpose." Final Rule, 90 Fed. Reg. at 48983. That is no standard of proof; it is a tautology. Without more, no employer can reasonably be expected to divine what conduct ED may find to be "substantial" or "material," rather than merely "incidental" or not "central." *Id.* at 48983.

### 5. Defendants Failed to Account for Reliance Interests.

It is arbitrary and capricious for an agency to fail to consider reliance interests. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). ED has failed to consider or address the significant reliance interests impaired by the Rule. State employers have raised significant reliance interests, including their interest in continuing to retain talented employees.[15] But ED did not directly address employers' reliance interests in the Final Rule, instead asserting without support that "the rule is unlikely to materially alter [recruitment and retention] incentives." Final Rule, 90 Fed. Reg. at 48969. But at the same time, ED's own Regulatory Impact Analysis indicates

---

2025) Doc No. 88-1 at 131 (Barbara McDowell Social Justice Center noting that the Rule "risks penalizing borrowers for the actions of their employers over which they have no control or knowledge, or forces them to constantly monitor their employers for potential legal exposure"); Diane Ortiz, Comment Letter (Sept. 16, 2025) Doc No. 88-1 at 215 (The Youth Alliance commenting that the Rule introduces "unnecessary ambiguity into eligibility criteria, which may disqualify well-meaning nonprofit organizations due to misinterpretations or isolated incidents unrelated to their primary mission"); Stephanie Williams, Comment Letter (Sept. 4, 2015) Doc No. 88-1 at 15 (private citizen commenting that ED lacks the capacity and expertise to investigate non-profits for "substantial illegal purpose," which is "undefined" thereby "opening the door for political oppression").

[15] *See supra* n. 1 (States' comment). Local governments raised similar reliance interests. *See, e.g.*, 33 Cities and Counties, Comment Letter (Sept. 17, 2025) Doc No. 88-1 at 657–58; City of Albuquerque, Comment Letter (Sept. 17, 2025) Doc No. 88-1 at 509; Cook County State's Attorney's Office, Comment Letter (Sept. 17, 2025) Doc No. 88-1 at 767; City and County of San Francisco, Comment Letter (Sept. 17, 2025) Doc No. 88-1 at 640; Office of the Public Defender for San Joaquin County, Comment Letter (Sept. 17, 2025) Doc No. 88-1 at 276; South Carolina Commission on Prosecution Coordination, Comment Letter (Sept. 17, 2025) Doc No. 88-2 at 114.

that certain public sector employees (those in "governance," "K-12 education, and higher education,") are more likely to be affected. *Id.* at 48995. Further, ED erroneously addresses borrowers' reliance interests by claiming ED will provide "clear notice [to borrowers] and the opportunity to change employers," s*ee id*. at 48984, when in fact ED has no way to identify all borrowers that would be affected by an employer's disqualification because borrowers are not required to submit employment information to ED until the end of a 10-year PSLF forgiveness term.

### III.    The Final Rule Should Be Vacated.

The APA directs reviewing courts to "hold unlawful and set aside agency action." 5 U.S.C. § 706(2)(A). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur of unlawful agency rules." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826–27 (2024) (Kavanaugh, J., concurring). Thus, "[t]he normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it." *Mass. v. Nat'l Institutes of Health*, 770 F. Supp. 3d 277, 329 (D. Mass. 2025) (collecting cases). Because the Rule is contrary to law, in excess of ED's statutory authority, and arbitrary and capricious, the Court should vacate it. The Court should also issue a declaratory judgment that the Rule is unlawful, which would "serve[] a valuable purpose" by clarifying the "legal rights and obligations of the parties." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 534 (1st Cir. 1995).

**CONCLUSION**

For the foregoing reasons, Plaintiff States respectfully request that the Court grant their motion for summary judgment; vacate the Rule; enter a declaratory judgment declaring the Rule unlawful; and award such other relief as this Court may deem just and proper.[16]

---

[16] Plaintiff States includes their instrumentalities and subdivisions.

Date: February 13, 2026                    Respectfully Submitted,

**ANDREA JOY CAMPBELL**                    **LETITIA JAMES**
  Attorney General of Massachusetts          Attorney General of New York

By: */s/ Victoria Roytenberg*               By: */s/ Jessica Ranucci*
Victoria Roytenberg, BBO No. 685283         Jessica Ranucci*
  *Assistant Attorney General*                *Special Counsel*
Michael Turi, BBO No. 706205                Shanna Tallarico*
  *Deputy Chief, Consumer Protection*         *Assistant Attorney General*
  *Division*                                28 Liberty Street
Yael Shavit, BBO No. 695333                 New York, NY 10005
  *Chief, Consumer Protection Division*     (929) 736-3392
Office of the Attorney General              jessica.ranucci@ag.ny.gov
1 Ashburton Pl.                             shanna.tallarico@ag.ny.gov
Boston, MA 02108
(617) 963-2387
victoria.roytenberg@mass.gov                *Attorneys for the State of New York*
michael.turi@mass.gov
yael.shavit@mass.gov


*Attorneys for the Commonwealth of*
*Massachusetts*


**PHILIP J. WEISER**                        **ROB BONTA**
  Attorney General of Colorado                Attorney General for the State of California

By: */s/ Martha U. Fulford*                 By: */s/ Daniel A. Osborn*
Martha Upton Fulford*                       Nicklas A. Akers, BBO No. 671415
  *Assistant Deputy Attorney General*         *Senior Assistant Attorney General*
Sam Wolter*                                 Bernard A. Eskandari*
  *Assistant Attorney General*                *Supervising Deputy Attorney General*
Colorado Department of Law                  Daniel A. Osborn*
1300 Broadway, #10                          Caroline E. Wilson*
Denver, CO 80203                              *Deputy Attorneys General*
720-508-6000                                1300 I Street
Martha.fulford@coag.gov                     Sacramento, CA 95814
Samuel.wolter@coag.gov                      Nicklas.Akers@doj.ca.gov
                                            Bernard.Eskandari@doj.ca.gov
                                            Daniel.Osborn@doj.ca.gov
*Attorneys for the State of Colorado*       Callie.Wilson@doj.ca.gov


                                            *Attorneys for the People of the State of*
                                            *California*

**KRISTIN K. MAYES**
  Attorney General of Arizona

By: */s/ Kathryn E. Boughton*
Kathryn E. Boughton*
  *Assistant Attorney General*
Office of the Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Kathryn.Boughton@azag.gov
ACL@azag.gov

*Attorney for the State of Arizona*

**WILLIAM TONG**
  Attorney General of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold*
  *Solicitor General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.skold@ct.gov

*Attorney for the State of Connecticut*

**KATHLEEN JENNINGS**
  Attorney General of the State of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Liston*
  *Director of Impact Litigation*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**BRIAN L. SCHWALB**
  Attorney General for the District of
  Columbia

By: */s/ Lindsay Marks*
Lindsay Marks*
  *Assistant Attorney General*
  *Public Advocacy Division*
Office of the Attorney General
for the District of Columbia
400 6th Street, N.W., 10th Floor
Washington, D.C. 20001
(202) 724-6649
lindsay.marks@dc.gov

*Attorney for the District of Columbia*

**ANNE E. LOPEZ**
  Attorney General for the State of Hawai'i

By: */s/ Kaliko'onālani D. Fernandes*
David D. Day*
  *Special Assistant to the Attorney General*
Kaliko'onālani D. Fernandes*
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

**KWAME RAOUL**
  Attorney General of Illinois

By: */s/ Katharine Roller*
Katharine Roller*
  *Complex Litigation Counsel*
Sarah J. Gallo*
  *Ethics Unit Supervisor*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 519-1842
Katharine.roller@ilag.gov

*Attorneys for the State of Hawaiʻi*

Sarah.gallo@ilag.gov

*Attorneys for the State of Illinois*

**AARON M. FREY**
  Attorney General for the State of Maine

By: */s/ Christina M. Moylan*
Christina M. Moylan*
  *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.: 207-626-8800
Fax: 207-287-3145
christina.moylan@maine.gov

*Attorney for the State of Maine*

**ANTHONY G. BROWN**
  Attorney General of Maryland

By: */s/ Keith M. Jamieson*
Keith M. Jamieson*
  *Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6960
kjamieson@oag.state.md.us

*Attorney for the State of Maryland*

**DANA NESSEL**
  Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti*
Daniel Ping*
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
PingD@michigan.gov

*Attorneys for the State of Michigan*

**KEITH ELLISON**
  Attorney General of Minnesota

By: */s/ Adam Welle*
Adam Welle*
  *Assistant Attorney General*
445 Minnesota Street, Suite 800
St. Paul, MN 55101
(651) 757-1425
Adam.welle@ag.state.mn.us

*Attorney for the State of Minnesota*

**AARON D. FORD**
  Attorney General of Nevada

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland*
  *Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

**JENNIFER DAVENPORT**
  Acting Attorney General of New Jersey

By: */s/ Andrew H. Yang*
Andrew H. Yang**
  *Deputy Attorney General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5278

Andrew.Yang@law.njoag.gov

*Attorneys for the State of New Jersey*

*Attorney for the State of Nevada*

**RAÚL TORREZ**
   Attorney General of the State of New
   Mexico

By: */s/ Olivia den Dulk*
Olivia den Dulk*
   *Assistant Attorney General*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
505-270-4332
odendulk@nmdoj.gov

*Attorney for the State of New Mexico*

**DAN RAYFIELD**
   Attorney General of Oregon

By: */s/ Leanne Hartmann*
Leanne Hartmann, BBO #667852
   *Senior Assistant Attorney General*
Kate E. Morrow*
   *Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Leanne.Hartmann@doj.oregon.gov
Kate.E.Morrow@doj.oregon.gov

*Attorneys for the State of Oregon*

**PETER F. NERONHA**
   Attorney General of Rhode Island

By: */s/ Chandana Pandurangi*
Chandana Pandurangi*
   *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2806
cpandurangi@riag.ri.gov

*Attorney for the State of Rhode Island*

**CHARITY R. CLARK**
   Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane*
   *Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

*Attorney for the State of Vermont*

**JAY JONES**
Attorney General of Virginia
By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge**
   *Solicitor General*
Mikaela A. Phillips**
   *Assistant Solicitor General*
Office of the Attorney General
202 N. 9th Street

**NICHOLAS W. BROWN**
   Attorney General of Washington
By: */s/ Erica R. Franklin*
Erica R. Franklin*
Julia Doyle*
   *Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Richmond, Virginia 23219
Tel: (804) 786-2071
Fax: (804) 786-1991
solicitorgeneral@oag.state.va.us
mphillips@oag.state.va.us

*Attorneys for the Commonwealth of Virginia*

Erica.Franklin@atg.wa.gov
Julie.Doyle@atg.wa.gov

*Attorneys for the State of Washington*


**JOSHUA L. KAUL**
  Attorney General of Wisconsin
By: */s/ Samuel T. Ward-Packard*
Samuel T. Ward-Packard*
  *Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8938
samuel.ward-packard@wisdoj.gov

*Attorney for Plaintiff State of Wisconsin*

*\* Admitted pro hac vice*

*\*\* Pro hac vice forthcoming*

## Certificate of Service and Rule 7.1 Certification

On February 13, 2026, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, District of Massachusetts, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2). I further certify that counsel for Plaintiffs conferred with counsel for Defendants, who have indicated they plan to oppose this motion. *See* Doc No. 82.

*/s/ Victoria Roytenberg*
Victoria Roytenberg
Counsel for Plaintiff Commonwealth of Massachusetts